UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILMINGTON TRUST COMPANY, a Delaware corporation, acting in its capacity as Owner Trustee of AEGCO Trust 1, and not in its individual capacity;<br>WILMINGTON TRUST COMPANY, a Delaware corporation, acting in its capacity as Owner Trustee of AEGCO Trust 2, and not in its individual capacity;<br>WILMINGTON TRUST COMPANY, a Delaware corporation, acting in its capacity as Owner Trustee of AEGCO Trust 5, and not in its individual capacity;<br>WILMINGTON TRUST COMPANY, a Delaware corporation, acting in its capacity as Owner Trustee of I&M Trust 1, and not in its individual capacity;<br>WILMINGTON TRUST COMPANY, a Delaware corporation, acting in its capacity as Owner Trustee of I&M Trust 2, and not in its individual capacity; and<br>WILMINGTON TRUST COMPANY, a Delaware corporation, acting in its capacity as Owner Trustee of I&M Trust 5, and not in its individual capacity,<br><div align="center">Plaintiffs</div><br><div align="center">v.</div><br>AEP GENERATING COMPANY, an Ohio corporation, and INDIANA MICHIGAN POWER COMPANY, an Indiana corporation,<br><div align="center">Defendants.</div> | **JUDGE MARRERO**<br><br>**13 Civ. _____ (     )**<br><br>**13 CV 5237**<br><br> |

<div align="center">

**COMPLAINT**

</div>

Thomas J. Giblin
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, New York 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864


Dated: July 26, 2013

OF COUNSEL:
Edward J. Shapiro
Drew C. Ensign
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201

COME NOW THE PLAINTIFFS, WILMINGTON TRUST COMPANY, a Delaware corporation, acting in its capacity as Owner Trustee of AEGCO Trust 1, and not in its individual capacity; WILMINGTON TRUST COMPANY, a Delaware corporation, acting in its capacity as Owner Trustee of AEGCo Trust 2, and not in its individual capacity; WILMINGTON TRUST COMPANY, a Delaware corporation, acting in its capacity as Owner Trustee of AEGCO Trust 5, and not in its individual capacity; WILMINGTON TRUST COMPANY, a Delaware corporation, acting in its capacity as Owner Trustee of I&M Trust 1, and not in its individual capacity; WILMINGTON TRUST COMPANY, a Delaware corporation, acting in its capacity as Owner Trustee of I&M Trust 2, and not in its individual capacity; and WILMINGTON TRUST COMPANY, a Delaware corporation, acting in its capacity as Owner Trustee of I&M Trust 5, and not in its individual capacity (the foregoing collectively the "Trusts"), and for their Complaint, allege as follows against each Defendant:

## NATURE OF THE ACTION

1.      This case arises in connection with "Rockport 2," a large, coal-fired electric power generating unit in Indiana. The Defendants lease Rockport 2 (also called the "Facility") from the Plaintiffs, and operate the Facility. The Defendants breached the lease and a related agreement by agreeing to the imposition on the Facility of severe, binding operating restrictions, in the form of a Consent Decree whose terms will bind the owner—indeed, any future operator—in perpetuity. The impact of these restrictions will be most onerous after the end of the lease term, yet the Defendants openly assert a right to return the Facility to the Plaintiffs at the end of the lease term with these restrictions unaddressed. Defendants' actions have injured the Plaintiffs' ownership interests dramatically. Here, in summary, is what has happened:

- The two affiliated Defendants built Rockport 2, completing it in 1989.

- That year, Defendants sold Rockport 2—which was conservatively estimated to have an economic useful life of 45-60 years—to the Plaintiffs.

- Simultaneously, the Plaintiffs leased the Facility back to the Defendants for 33 years.

- This arrangement intentionally made Plaintiffs' continuing ownership of the Facility after the end of the Defendants' lease very valuable to the Plaintiffs. The Plaintiffs were to capture the residual value of their Facility ownership after the end of the lease either by operating Rockport 2 for their own account, leasing the Facility to a third party, or leasing the Facility to Defendants pursuant to certain options conferred upon the Defendants.

- One Defendant (Indiana Michigan Power Company, or "I&M") is the government-licensed "Operator" of the Facility. I&M will continue to serve as Operator throughout the term of the lease. To protect the value of the Plaintiffs' residual ownership interest, I&M will continue to act as Operator even after the end of the lease (on a cost-reimbursement basis) until licensing authorities have approved transfer of its Operator's license to a successor.

- This sale/leaseback transaction involved a host of contracts, which were negotiated and executed at the offices of Defendants' lawyers and bankers in Manhattan, near the offices of the Plaintiffs' lawyers, bankers and business representatives. The contracts at issue are expressly governed by

2

New York law (with minor exceptions inapplicable to this action) under choice of law clauses in the contracts.

- Approximately 20 years into the lease term, I&M and certain of its affiliates were sued in a series of actions alleging serious violations of environmental law (the "Environmental Actions"). I&M and its affiliates settled the Environmental Actions by voluntarily agreeing to a Consent Decree, which was entered in 2007 and modified significantly in 2013.

- **The Environmental Action allegations had nothing to do with Rockport 2. Instead, they concerned *other* facilities the Defendants and/or their affiliates own and operate.** Nevertheless, I&M and Defendants' affiliates (the "Environmental Action Defendants") voluntarily included in the Consent Decree provisions that will require the Facility to shut down shortly after the end of the lease term (but well before the end of its economic useful life) unless approximately $1.4 billion in pollution control "scrubbers" have been installed by that time.

- The Consent Decree also imposed a variety of emissions limits directly and indirectly on Rockport 2. These limits are more rigorous than the law otherwise requires, and become progressively more restrictive over time.

- All of these restrictions included in the Consent Decree will bind the Facility in perpetuity because the Consent Decree expressly binds I&M as the licensed "Operator," and obligates I&M to bind any transferee of its Operator's license to the same restrictions.

3

- Not only are the Consent Decree restrictions effectively perpetual, the impact of these restrictions will arise primarily and most onerously *after* the end of the lease term, and they therefore burden the Plaintiffs' interests dramatically.

- The Environmental Action Defendants gratuitously agreed to saddle Rockport 2 with these restrictions on its future operation to serve interests of their own, by allowing them to settle claims that they had broken the law elsewhere in their extensive system.

Thus, the Environmental Action Defendants traded away the value of the Plaintiffs' future operating rights and freedoms in order to settle unrelated allegations against themselves and their affiliates. By taking these actions and failing to protect the Plaintiffs' interests thereafter, Defendants breached express promises made in the lease and in a related agreement to protect Plaintiffs' residual interests in the Facility—and not to encumber Rockport 2 with unsatisfied future obligations—as well as similar promises implied into those contracts by New York law.

2.      The Environmental Action Defendants' acquiescence in the Consent Decree took place in stages:

- The Environmental Actions were filed between 1999 and 2005, and settled through a Consent Decree in 2007.

- The original Consent Decree required installation of scrubbers at the Facility by 2019—three years before the end of the lease term (and therefore at Defendants' expense, under the terms of the lease).

- In 2013, the Environmental Action Defendants negotiated for a modification of the Consent Decree, by which they voluntarily agreed to

shut Rockport 2 down either at the end of 2025, or at the end of 2028 (three or six years **after** the end of the lease term, but in either case well before the end of the Facility's useful life) unless the scrubbers have been installed by that date.

- The Environmental Action Defendants also voluntarily agreed in 2007 to subject Rockport 2 to various direct and indirect future limits not otherwise required by law on its emission of various pollutants, and made these limits substantially more stringent in the 2013 modification.

- In 2013, the Defendants made it clear that they reserve the right not to install scrubbers, and to return the Facility to the Plaintiffs subject to an unsatisfied obligation to do so in order to operate in the future.

Thus, after voluntarily burdening Rockport 2 with the obligations of the 2007 Consent Decree, the Defendants orchestrated a deferral of the deadline for compliance. They did so to seek the option to impose on the Plaintiffs the operational impact of, and/or financial responsibility for, compliance with the obligations that the Defendants themselves had voluntarily created.

3.     The Plaintiffs had specifically guarded in their contracts with the Defendants against just such abuse of the Defendants' long-term leasehold possession and operational control of Rockport 2. Among other things, the Defendants promised in the lease, and in the "Participation Agreement" by which the general terms of the entire sale/leaseback transaction were established, to protect Rockport 2 by covenanting:

- not to take any action that would materially adversely affect either the economic useful life of Rockport 2 or Plaintiffs' interest in the Facility after the end of the lease term; and

5

- not to allow encumbrances on the operating capability of Rockport 2, on their own interests or title, or on the interests or title of the Plaintiffs—and to take action promptly to discharge any such encumbrances that might arise.

In addition to these express contractual covenants to protect the Plaintiffs' residual interests, Defendants also implicitly promised (as in any contract) to deal fairly and in good faith, so as not to deprive the Plaintiffs of the expected fruits of the contract.

4.     The Defendants' maneuvers to create the overhanging $1.4 billion financial obligation they have imposed on Rockport 2 breached each of these promises, and subjected the Plaintiffs to uncertainty they expressly bargained to avoid. This overhanging burden has imposed severe and continuing injury on the Plaintiffs.

5.     Plaintiffs do not challenge entry of the Consent Decree, and no aspect of any relief sought here requires or contemplates any disturbance of any provision of that order. Instead, Plaintiffs seek in this action a judgment requiring the Defendants to act (consistently with the terms of the Consent Decree) to comply with the contractual promises they made to the Plaintiffs—and not to allow the encumbrance and other restrictions they have created for the Facility to impair the value of the Plaintiffs' ownership interests in Rockport 2. The injury to Plaintiffs should be redressed through:

- a judgment for Plaintiffs declaring that Defendants breached the lease and the Participation Agreement, and that Defendants must satisfy (at their own sole expense) the restrictive operating conditions they voluntarily arranged to impose on Rockport 2;

6

- a declaration that Defendants must hold Plaintiffs harmless from any financial impact of the restrictive operating conditions to which Defendants agreed in the Consent Decree;

- an injunctive order mandating Defendants' specific performance of their contractual obligation to the Plaintiffs to satisfy the restrictive operating conditions and retaining jurisdiction to award damages if they fail to do so successfully; and

- a further award of damages in this action to compensate Plaintiffs for quantifiable injury already suffered.

## FACTS

Plaintiffs provide immediately below brief structural background concerning the sale/leaseback transaction, in order to promote clarity in the identification of parties and discussion of jurisdiction and venue that follows immediately thereafter.

*The Rockport 2 Plant And The Sale/Leaseback*

6. Defendants Indiana Michigan Power Company ("I&M") and its affiliate AEP Generating Company ("AEG") operate in the electric power industry. AEG sells electric power at wholesale and I&M transmits and distributes electric power to retail customers. I&M and AEG (collectively, the "Defendants") are affiliated, and (together with other affiliated utilities) act in concert to manage a fleet of power plants and transmission facilities in pursuit of their business. In the 1980s, the Defendants developed two large coal-fired electric generating units near Rockport, Indiana—on the "Rockport Plant Site." These units are known as Rockport Unit 1 ("Rockport 1"), which was completed and placed into service in 1984; and Rockport Unit 2 ("Rockport 2"), which was completed and placed into service in 1989. I&M and AEG own

7

Rockport 1. Immediately before the sale/leaseback of the Facility, each Defendant also owned a 50% undivided interest in Rockport 2 and the underlying land (the "Rockport 2 Site").

7.     Rockport 1 and Rockport 2 are electric generating units with outputs of just over 1,300 megawatts each, giving the Rockport Plant a total generating capacity of 2,600 megawatts. Rockport 1 and Rockport 2 share certain structures, systems and related equipment on or near their respective sites (the "Common Facilities") that are used in the operation of both units. Each unit is operated by I&M as the governmentally licensed "Operator." Rockport 1 and Rockport 2 are among the largest coal-fired units in the country, are efficient and low-cost performers for I&M, and are relatively young for coal-fired electric generating units.

8.     In order to refinance their cost of building Rockport 2, the Defendants decided to pursue a sale and leaseback arrangement, by which Defendants would sell undivided interests in Rockport 2 (the "Undivided Interests") to equity investors, and simultaneously lease such Undivided Interests back from the respective purchasers. The leases are for a period of 33 years, with certain renewal options exercisable by Defendants. To implement the transaction, each equity investor formed a pair of common law trusts of which it was beneficial owner: one to buy an Undivided Interest from I&M; and the other to buy an Undivided Interest from AEG. Each trust entered into substantively identical agreements with each Defendant respecting a percentage of that Defendant's original plant ownership interest—such that each equity investor, or "Owner Participant" had one trust buy half of its total Undivided Interest in the Facility from I&M, and the other trust buy the other half of its total Undivided Interest in the Facility from AEG. Such a sale/leaseback arrangement has, during various periods over the course of the last several decades, been a commercially attractive way for developers of large infrastructure projects, like the Defendants, to spread the cost of development over time and to unburden their balance sheets

of the substantial asset and corresponding liability that such projects represent.  Of course, the equity investors, as owners of these facilities, require and expect to receive a return on investment in exchange for their substantial financial commitment and risk.

9.     Accordingly, as Rockport 2 neared completion, the Defendants and their investment bankers marketed the sale/leaseback of Rockport 2 to various institutional equity investors.  Through meetings and negotiation sessions held in Manhattan at the offices of the Defendants' bankers and lawyers, Defendants reached agreement with several institutions to enter into the sale/leaseback transaction.  In March 1989, each of these investors executed a Participation Agreement with the Defendants and others by which they agreed to the basic terms of the sale/leaseback.  The Owner Participants agreed:  (a) to contribute equity capital to trusts they would establish to buy their Undivided Interests, (b) to cause the trusts to borrow to help finance the investment, and (c) to cause these trusts to enter the sale/leaseback arrangement by executing a series of related "Transaction Documents."  The parties, including the Owner Participants and the common law trusts on whose behalf the Trustee is suing herein (the "Trusts"), accordingly entered into these Transaction Documents at the same time they executed the Participation Agreements.

10.     Each sale/leaseback of each Trust's Undivided Interest in Rockport 2 involved more than a dozen significant contracts with one of the Defendants, as well as scores of certificates, corporate documents, opinions of counsel, side letters and other instruments.  Hundreds of separate documents implementing the transaction as a whole were delivered at a closing in the Manhattan offices of the Defendants' counsel, on or about December 7, 1989.  Some of the original Owner Participants have since sold their interests to third party purchasers.

Some of the Trusts for whom the instant suit is brought are beneficially owned by original Owner Participants, while others are beneficially owned by subsequent purchasers.

*The Parties, Jurisdiction And Venue*

11.　　Plaintiff Wilmington Trust Company is a Delaware corporation with its principal place of business in Wilmington, Delaware, and is acting herein solely in its capacity as the "Owner Trustee" of each of the following Trusts, and not in its individual capacity.

　　　a.　　AEGCO Trust 1 is a common law trust organized under the laws of the State of Delaware, for the purpose of entering into the Transaction Documents with AEG on behalf of Philip Morris Credit Corporation (now Philip Morris Capital Corporation, or "PMCC") as Owner Participant. PMCC is a corporation organized under the laws of Delaware with its principal place of business in Stamford, Connecticut. AEGCO Trust 1 owns approximately 50% of the Undivided Interests in the 50% of Rockport 2 conveyed in the sale/leaseback by AEG.

　　　b.　　I&M Trust 1 is a common law trust organized under the laws of the State of Delaware, for the purpose of entering into the Transaction Documents with I&M on behalf of PMCC as Owner Participant. I&M Trust 1 owns approximately 50% of the Undivided Interests in the 50% of Rockport 2 conveyed in the sale/leaseback by I&M.

　　　c.　　AEGCO Trust 2 is a common law trust organized under the laws of the State of Delaware, for the purpose of entering into the Transaction Documents with AEG on behalf of NYNEX Credit Company (now known as Verizon Capital Corp., or "VCC") as Owner Participant. VCC is organized under the laws of Delaware, with its principal place of business in New York, New York. AEGCO Trust 2 owns approximately

23.53% of the Undivided Interests in the 50% of Rockport 2 conveyed in the sale/leaseback by AEG.

       d.      I&M Trust 2 is a common law trust organized under the laws of the State of Delaware, for the purpose of entering into the Transaction Documents with I&M on behalf of VCC as Owner Participant. I&M Trust 2 owns approximately 23.53% of the Undivided Interests in the 50% of Rockport 2 conveyed in the sale/leaseback by I&M.

       e.      AEGCO Trust 5 is a common law trust organized under the laws of the State of Delaware, for the purpose of entering into the Transaction Documents with AEG on behalf of SNET Credit Inc. ("SNET") as Owner Participant. Aircraft Services Corporation ("ASC") succeeded to all of SNET's rights, titles and interests as Owner Participant of AEGCO Trust 5 by purchase of those rights, titles and interests on January 17, 2008. ASC is a corporation organized under the laws of Nevada, with its principal place of business in Stamford, Connecticut. AEGCO Trust 5 owns approximately 5.88% of the Undivided Interests in the 50% of Rockport 2 conveyed in the sale/leaseback by AEG.

       f.      I&M Trust 5 is a common law trust organized under the laws of the State of Delaware, for the purpose of entering into the Transaction Documents with I&M on behalf of SNET as Owner Participant. ASC succeeded to all of SNET's rights, titles and interests as Owner Participant of I&M 5 by purchase of those rights, titles and interests on January 17, 2008. I&M Trust 5 owns approximately 5.88% of the Undivided Interests in the 50% of Rockport 2 conveyed in the sale/leaseback by I&M.

       g.      As owners of Undivided Interests in Rockport 2, each of the trusts is permitted to act independently of the other trusts. The Plaintiff Trusts therefore have full

right and authority to bring this action even though other trusts, owning approximately 20.59% of the Undivided Interests, are not Plaintiffs in this action. (None of these other trusts or their beneficial owners are organized in, or have their principal place of business in, either Indiana or Ohio.)

12. Defendant Indiana Michigan Power Company ("I&M") is a corporation organized under the laws of Indiana with its principal place of business in Columbus, Ohio. I&M engages in the generation, transmission and distribution of electric power.

13. Defendant AEP Generating Company ("AEG") is a corporation organized under the laws of Ohio, with its principal place of business in Columbus, Ohio. AEG engages in the business of selling power at wholesale to affiliates including I&M.

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction), because the amount in controversy between each Trust represented herein, and each Defendant sued herein, exceeds $75,000 exclusive of interest and costs, and there is complete diversity of citizenship between the Plaintiffs and the Defendants.

15. This Court has personal jurisdiction over I&M and AEG pursuant to N.Y. C.P.L.R. § 302(a)(1) because, among other things, I&M and AEG marketed and negotiated the contracts whose breach is alleged herein, as well as a number of related transactions, within this judicial district, and because each Defendant executed and delivered each of these contracts and related transaction documents in this judicial district.

16. Venue lies in this District under 28 U.S.C. § 1391(b)(1) and (2), because each Defendant is subject to personal jurisdiction in this judicial district with respect to this action and therefore resides in this judicial district, and because a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

*The Transaction Documents*

17.     Because each Trust purchased a percentage Undivided Interest in Rockport 2 from each of the Defendants, each Trust entered into a substantively identical set of Transaction Documents with each of the two Defendants.  These Transaction Documents are substantively identical from Trust to Trust, and from Defendant to Defendant, for purposes of this action.  This Complaint therefore refers to each type of Transaction Document in the singular for ease of reference.  Thus, for example, the six substantively identical Facility Leases between the parties to this action are collectively referred to in the singular as the "Facility Lease," and so on.

18.     While there are numerous other Transaction Documents which together constituted a voluminous closing binder with respect to each Undivided Interest purchased from, and leased back to, each of the Defendants, Plaintiffs describe those of principal importance to this action below.  In these instruments, Defendants expressly covenanted:  (a) not to take any action to impair any aspect of the Trusts' Undivided Interests in Rockport 2; (b) not to encumber Rockport 2 with limitations on its use or on transfers of interest by either the Trusts or the Defendants; and (c) to satisfy and terminate any such encumbrance that arose.

a.     *The Participation Agreement.*  As indicated above, this agreement established the overall framework for the sale/leaseback transaction.  Among other things, it required Defendants to protect the value of the Trusts' residual interests in the Facility by doing nothing to impair the economic useful life of the Facility.  The Participation Agreement contains an express choice of law clause providing that the law of New York governs the contract.  A correct copy of the Participation Agreement between one of the Defendants and one of the Trusts (highlighted to aid the Court in referring to specific provisions cited below) is attached hereto as Exhibit 1.

b.  *The Bill of Sale.*  Each Trust purchased its Undivided Interest from each Defendant pursuant to a Bill of Sale.  These Bills of Sale conveyed only Rockport 2 and the fixtures at the Rockport 2 Site; each of the Defendants retained its 50% undivided interest in the underlying Rockport 2 Site.

c.  *The Ground Lease.*  Each Defendant leased an undivided interest in the Rockport 2 Site (the "Rockport 2 Site Interest") to each Trust pursuant to a Ground Lease and Easement Agreement (the "Ground Lease").  The percentages each Trust leased from each Defendant matched the percentages of such Trust's Undivided Interest purchases of Rockport 2.  The Ground Lease has a term of 44 years, 4 months, and may be extended to the end of Rockport 2's economic useful life (as determined by an appraisal in 2022), at each Trust's option.  In the Ground Lease, the Defendants conveyed to the Trusts an easement to use the adjacent Rockport 1 site, the Defendants' personal property on the Rockport 2 Site, and the Common Facilities to operate and maintain Rockport 2 for the duration of that Ground Lease.

d.  *The Facility Lease.*  Through a "Facility Lease," each Trust leased its Undivided Interest in Rockport 2 and subleased its Rockport 2 Site Interest to each of the two Defendants (*i.e.*, the Undivided Interest it had acquired from I&M back to I&M, and the Undivided Interest it had acquired from AEG back to AEG) for a Basic Lease Term of 33 years, from December 7, 1989 through December 7, 2022.  As Lessee, each Defendant has the option (but not the obligation) to extend its Facility Lease under two alternative term and pricing formulas into one or more Renewal Terms (depending upon the form of its option exercise, if any).  Neither Defendant has acted to extend the Basic Lease Term by exercise of any option for a renewal term, and the Defendants do not have

14

to decide whether to exercise that right until June 2021. A correct copy of the Facility Lease between one of the Defendants and one of the Trusts (highlighted to aid the Court in referring to specific provisions cited below) is attached hereto as Exhibit 2.

      e.    *The Operating Agreement.* The Trusts, the Owner Participants and their predecessors were and are financing parties without direct operational capability in electric power generation. Moreover, unlike the Defendants, the Trusts and Owner Participants have never maintained any regular physical presence at Rockport 2. The Trusts and their beneficiaries therefore required some assurance that I&M would make its services as Operator available to them after the end of the Facility Lease in order to protect the value of the Trusts' residual interest. Accordingly, each Trust entered into the Unit 2 "Operating Agreement" with the Defendants. (Unlike the other Transaction Documents, there is only one Operating Agreement and it is signed by each of the Defendants and the Trusts.) The Operating Agreement provides, among other things, that after the Facility Lease ends, I&M will continue to operate Rockport 2 on a cost-reimbursement basis for the benefit of the respective Trusts, and that at that time I&M will transmit electric energy to the market so the Trusts can sell the Facility's capacity and output to third parties. As Operator, I&M is under a number of obligations to operate and maintain Rockport 2 in accordance with good commercial practice after the Facility Lease ends. However, the Operating Agreement itself does **not** obligate I&M to pay for any major capital improvements needed to continue operations at Rockport 2 after the end of the Facility Lease. Finally, I&M is not permitted to resign as Operator (except under very narrow conditions). (Even in the event of I&M's removal or resignation as

the licensed Operator, it is obligated to cooperate in and use reasonable efforts to achieve

the transfer of its Operator's license to its successor.)

*Key Purposes And Provisions Of The Facility Leases And The Sale/Leaseback*

19.     The commercial attractiveness of the sale/leaseback arrangement to the Owner

Participants arose from several sources, including the rent payments during the Basic Lease

Term, certain tax benefits related to the ownership of the leased property, accounting treatment

accorded such leases, and the residual value of Rockport 2 during the period after the end of the

Basic Lease Term. Realization of this residual value required that Rockport 2 have a significant

economic useful life and value at the end of the Basic Lease Term. Indeed, the tax rules

applicable to leases *mandate* that expected remaining useful life and residual value after the end

of the lease term represent at least 20% of the total economic useful life and fair market value,

respectively, of the leased property.

20.     In light of their non-operating ownership, the lengthy duration of the Basic Lease

Term, and their need to protect the value of their residual and other interests throughout the

Lease Term and beyond, the Trusts obtained a number of protections through covenants made by

the Defendants as Lessees in the Facility Lease. In general, these protections obligated the

Defendants to pay on time without excuse, to operate on a commercially efficient basis, to

protect Rockport 2's economically useful life by appropriate operations and maintenance, to fund

all physical improvements and other actions necessary to comply with all applicable law, and not

to burden Rockport 2 with actual or contingent future obligations that might hinder or restrict

operation of the Facility in the future. In particular:

        a.     The Defendants agreed, in the Participation Agreement (whose terms are

incorporated by reference in the Facility Lease), "not to take any action (or omit to take

16

any action) . . . the taking or omission of which will materially adversely affect the operation, safety, capacity, economic useful life or any other aspect of [Rockport 2] (including the Undivided Interest)." Facility Lease § 20 (incorporating Section 6.01(j) of the Participation Agreement by reference). Thus, the Defendants promised broadly not to take any action to materially adversely affect the economic interests of the Trusts in their Undivided Interests in Rockport 2 including, *inter alia*, their total generating capability and their residual interests.

b.       The Defendants agreed to maintain and preserve Rockport 2's operating efficiency in accordance with applicable law, warranty conditions, insurance covenants and electric power industry standards, and in connection with that obligation to ensure that Rockport 2 has the capacity and functional ability to perform normal commercial operation on a continuing basis (ordinary wear and tear excepted). Facility Lease § 8(a).

c.       The Defendants agreed to make no voluntary modifications to Rockport 2 that would shorten its economic useful life. Facility Lease § 8(c).

d.       The Defendants agreed to pay the costs of operations, maintenance and modifications to Rockport 2 (whether made voluntarily or under compulsion of law) during the Lease Term. *Id.*

e.       The Defendants agreed they would "not directly or indirectly create, incur or suffer to exist any Lien on or with respect to the Undivided Interest . . ., the Lessor's title thereto or interest therein, . . . or any title or interest of the Lessee therein, except Permitted Liens." Facility Lease § 7. "Liens" include "any . . . encumbrance . . ., easement . . . or charge of any kind" on the applicable interest. Facility Lease App. A (Definitions) at p. 10. Thus, the Facility Lease requires that the Defendants do nothing

17

during the term of their leaseholds: (i) to incur or create a specially applicable legal constraint on the Trusts' right, or the Defendants' own right, to operate Rockport 2 or use the Rockport 2 Site Interest; or (ii) to incur or create a legal cloud on either (A) the Trusts' title to Rockport 2, or their freedom to transfer that title fully and without operating constraint on the new owner, or (B) the Defendants' own title to the Rockport 2 Site. While certain government actions are exempt from this proscription because they are defined as Permitted Liens, these include only actions that the government takes unilaterally to "control or regulate" the Facility, without any need for collaboration or consent of the Defendants. *Id.,* at p. 13.

  f.  The Defendants further promised to "take such action as may be necessary duly to discharge promptly any such Lien as might arise." Facility Lease § 7.

  g.  The Facility Lease included a provision expressly allowing the Trusts to forbear from asserting or enforcing rights arising from any breach by Defendants without concern that any "express or implied waiver" of any right be deemed to arise from such "failure or delay" by the Trusts to exercise any such right. Facility Lease § 16(c).

  h.  The Defendants agreed that (unless one or both of them purchased Rockport 2) they would turn Rockport 2 over to the Trusts in compliance with the requirements described above at the end of the Lease Term. Facility Lease § 5.

  i.  Finally, both the Facility Lease and the Participation Agreement expressly chose New York law to the maximum extent permissible under general common law principles. Specifically, the Participation Agreement expressly provides that it is to be "governed by and construed in accordance with the law of . . . the State of New York." Participation Agreement § 11.07. The Facility Lease provides that it "shall be governed

by and construed in accordance with the law of the State of New York, except as to matters relating to the creation of the leasehold and subleasehold estates hereunder and the exercise of rights and remedies with respect to such leasehold and subleasehold estates, which shall be governed by and construed in accordance with the law of the State of Indiana." Facility Lease § 21(f). Thus, the Facility Lease applies Indiana law only with respect to rights to own and occupy real property in that state (just as the common law would likely do even were this exception not expressly included in the Facility Lease), and otherwise applies New York law to govern the scope and enforcement of the parties' covenants—which is what this Complaint concerns.

21.    One of the key principles embedded in these provisions was the Defendants' duty to protect the value of the Trusts' residual interests from the adverse economic effects of either (i) a limitation or restriction on use, or (ii) an obligation to make capital improvements that might arise from the Defendants' own actions during the term of the leasehold but apply only after the Defendants had turned economic responsibility for Rockport 2 back to the Trusts. The economic value of the Trusts' residual interests after the end of the Facility Lease term was thereby to be protected from the economic effects of obligations or limitations the Defendants incurred by operation of Rockport 2 for their benefit, but whose impact affected the Facility only after Defendants' lease term ended.

22.    The Participation Agreement also contains a "General Indemnity" in favor of each of the Trusts, by which the Defendants agree (among other things) to reimburse the Trusts and the Owner Participants for any and all "Expenses," including (a) liabilities and obligations incurred by action of the Defendants, and (b) legal fees and related expenses incurred by the

necessity to protect the Trusts' and/or the Owner Participants' interests in Rockport 2.
Participation Agreement § 7.01.

23.     The parties fully understood and intended that the Owner Participants' beneficial interests in their respective Trusts were to be, in essence, financial instruments that are freely transferable to qualified investors. Defendants' continuous compliance with their obligations as Lessees was expected to afford the Owner Participants the opportunity to sell their interests as and when their financial strategies and general market conditions made a sale attractive to them.

*The Environmental Action Defendants Are Sued In A Series of Enforcement Actions Relating To Other Facilities*

24.     In 1999, 2004 and 2005, I&M and a number of affiliates of both Defendants were sued in the Environmental Actions by the United States Environmental Protection Agency ("EPA"), several States, and some private environmental organizations (collectively the "Environmental Action Plaintiffs"), for noncompliance with (*inter alia*) the Clean Air Act. The Environmental Action Plaintiffs alleged that the Environmental Action Defendants had made "major modifications" at certain power plants in their system without obtaining and installing pollution controls.

25.     None of the complaints in any of the Environmental Actions alleged violations at Rockport 2, either by Defendants or anyone else. I&M was an Environmental Action Defendant based on its ownership and operation of another facility more than 100 miles from Rockport 2. Neither the Trusts nor the Owner Participants were ever party to any proceedings in the Environmental Actions.

26.     The Environmental Action complaints sought injunctions to shut down all thirteen units that were the subject of the complaints immediately, until the requisite emission controls

were installed, and civil penalties of more than $100 million against the Environmental Action Defendants.

27.    The Environmental Actions were consolidated before the United States District Court for the Southern District of Ohio (Eastern Division). The Environmental Action Defendants settled all of these actions before any decision could be rendered, by agreeing to a Consent Decree. A correct copy of the Consent Decree as entered in 2007 is attached hereto as Exhibit 3. The Consent Decree expressly provided that it could be modified only by a subsequent written agreement signed by all of the parties to it, and could be modified materially only upon court approval. Consent Decree ¶ 199.

*The Environmental Action Defendants Settle Claims Against Other Facilities By Agreeing To Impose Restrictive Conditions on Rockport 2*

28.    In the Consent Decree, the Environmental Action Defendants agreed to a number of remedies including payment of money to the Environmental Action Plaintiffs. Defendant I&M also voluntarily agreed, as part of the consideration for resolution of the specific claims made with respect to other plants in the Environmental Actions, to make certain expensive modifications at, and impose operating limits on, Rockport 2. Specifically, the Environmental Action Defendants voluntarily undertook to include the following obligations relating to Rockport 2 in the Consent Decree:

    a.    The Consent Decree required the Defendants to install Selective Catalytic Reduction pollution control devices for reduction of nitrogen oxide ("$NO_x$") emissions at Rockport 2 on or before December 31, 2019. Consent Decree ¶ 68.

    b.    The Consent Decree required Defendants to install Flue Gas Desulfurization ("FGD") system pollution control devices (also called scrubbers) for the reduction of sulfur dioxide ("$SO_2$") emissions at Rockport 2 by that same date (the

"Scrubber Mandate"). FGD scrubbers are time-consuming and expensive to field. Consent Decree ¶ 87. Industry experience shows that it can take more than four years to plan, design, permit, construct and install such systems, and the cost of fielding FGD scrubbers at Rockport 2 is estimated at approximately $1.4 billion.

c.      The Consent Decree imposed limits on the collective emissions of $NO_x$, and the collective emissions of $SO_2$, by Rockport 2 and 45 other generating units owned and operated by the Environmental Action Defendants or their affiliates (which it called the "AEP Eastern System"). These system limits (the "AEP System Emissions Caps") were stricter than those otherwise required by law, and may curtail the future operations and value of Rockport 2 (based in part on inefficiencies at other plants which the Trusts cannot control). Consent Decree ¶ 86.

d.      The Consent Decree obligated the Environmental Action Defendants (and their successors/assignees) collectively to surrender certain "$NO_x$ Allowances" and "$SO_2$ Allowances" (*i.e.*, valuable, tradable pollution credits) in the future, under circumstances in which they would otherwise have no obligation to do so. Consent Decree ¶¶ 74, 76, 77, 79, 93. This "Allowance Surrender Obligation" will deprive the Trusts of value otherwise available from Rockport 2's output after reversion of the Facility to them following the Basic Lease Term.

29.      Upon unanimous joint motion by the Environmental Action Plaintiffs and Defendants, the United States District Court for the Southern District of Ohio entered the Consent Decree in the form proposed by the parties on December 10, 2007.

30.      The requirements of the Consent Decree will bind Rockport 2 to these requirements in perpetuity.

a.     The Consent Decree specifically requires Defendant I&M to comply with all of its terms, unless and until I&M transfers its operational interests in the Facility pursuant to procedures specified by the Consent Decree itself.  Consent Decree ¶¶ 178 (providing for enforcement of Consent Decree against I&M and other parties until termination of enforcement rights against them) and 215-16 (permitting termination of enforcement rights against I&M and other Environmental Action Defendants only after compliance and/or inclusion of requirements in operating permits that bind the Facility, among other conditions).  EPA and the other Environmental Action Plaintiffs are in a position to enforce I&M's compliance obligation, because as owner of the land and operator of the Common Facilities necessary to operate Rockport 2 (not to mention associated transmission facilities), I&M is in a position to prevent physically the generation of power at Rockport 2 and/or the transmission of electricity generated there for sale.

b.     The Consent Decree also specifically prohibits each of the Defendants from transferring any operational or ownership interest in Rockport 2 to any third party unless and until that third party executes a Consent Decree modification expressly subjecting itself to all requirements of the Consent Decree as a party.  Consent Decree ¶¶ 191-92.  Thus, neither Defendant is permitted under the Consent Decree to transfer either its title to the Rockport 2 Site, or its leasehold interest in Rockport 2, to any third party without obtaining that third party's binding legal commitment to comply with all Rockport 2-related requirements of the Consent Decree by signing that instrument as a party.

23

  c.  Similarly, I&M cannot transfer its interests as Operator of Rockport 2—including its contractual responsibility to conduct operations, and its Title V Operating Permit issued by EPA—without first obtaining the transferee's written commitment to be bound by the terms of the Consent Decree as a party. *Id.*

  31. Plaintiffs neither asserted nor sought to enforce any right under any of the Transaction Documents in the wake of the Environmental Action Defendants' agreement to the Consent Decree in 2007. *Inter alia*, it appeared that the Defendants were committed to compliance with the terms of the Consent Decree within the term of the Facility Lease, and that they would in fact comply. Moreover, the Trusts were protected from any assertion of "waiver by silence" by the express provisions of the Facility Lease, which states that no "express or implied waiver" is to arise from any Trust's "failure or delay . . . in exercising any right" under the Facility Lease arising from any breach of any covenant by the Defendants. Facility Lease § 16(c).

*The Defendants Orchestrate A Change In The Consent Decree*

  32. In 2012, seven years before their deadline under the 2007 Consent Decree to install scrubbers at Rockport 2, the Defendants took steps to alter that commitment they had voluntarily made. Along with the other Environmental Action Defendants, I&M moved for court permission to install substantially less expensive pollution control technology at Rockport 1 and Rockport 2 to satisfy the Scrubber Mandate. But their attempt to install this technology instead of scrubbers met opposition. So they negotiated a different form of relief that benefited them, at the Trusts' expense.

  33. Unable to alter the commitment they had voluntarily undertaken to install FGD scrubbers, Defendant I&M and the other Environmental Action Defendants negotiated a Consent

Decree modification deferring the deadline for compliance from December 31, 2019 to December 31, 2025—taking the effective date of the FGD scrubber installation requirement outside the term of the Facility Lease. As a part of that arrangement, I&M agreed to shut down, or "retire," Rockport 2 on that date—three years after the end of the Facility Lease Term—unless FGD scrubbers are installed by then. (Under certain unlikely circumstances, Defendants may elect to defer this requirement for three years, to December 31, 2028—but only at the expense of either spending $1.4 billion on Rockport 1 or shuttering that Facility (which it owns) by the December 31, 2025 deadline. Whatever choice Defendants make, this requirement will affect Rockport 2 long before the end of its design life.) I&M also agreed to accept an $SO_2$ emissions cap applicable to Rockport 1 and Rockport 2 (collectively) both before and after the installation of such scrubbers, thereby creating a highly burdensome restriction on the otherwise lawful operation of Rockport 2 after 2025. Specifically:

a.     On October 31, 2012, I&M and the other Environmental Action Defendants filed an "Application for Judicial Interpretation of Consent Decree" in the Environmental Actions, asking the Ohio federal court to state explicitly that installation of a dry sorbent injection ("DSI") system at Rockport 2 would comply with the 2007 Consent Decree requirement to install an FGD system. The Environmental Action Plaintiffs vigorously opposed the request, arguing that the Application was a thinly-disguised request for relaxation of the Scrubber Mandate. The Environmental Action Defendants took the opportunity presented by the debate over their Application to agree voluntarily with the Government on a variety of new requirements through comprehensive amendment of the Consent Decree.

b. This amendment involved changes to a variety of emissions limit requirements and plant modification requirements from those originally set forth in the Consent Decree. These new requirements were reflected in a Consent Decree "Modification" agreed to by the Environmental Action Defendants and the other parties to the Environmental Actions. A correct copy of the Modification, as entered, is attached hereto as Exhibit 4.

c. In the Modification, I&M: (i) agreed to require installation of the substantially less expensive and less effective DSI system at Rockport 2 by April 2015, and (ii) agreed that imposition of the requirement to install FGD scrubbers at Rockport 2 would be deferred to 2025—but that the Facility would be shut down if this improvement is not made by that date. This "Operating Restriction" became a fully binding term of the Consent Decree after the Environmental Action Defendants obtained the Modification. Third Joint Modification to Consent Decree ¶ 9, modifying Consent Decree ¶ 87. (The Modification identifies two permitted alternatives to installation of FGD scrubbers as a condition of continued operations past December 31, 2025, but each greatly impairs the value of the Facility because they are likely to be economically inferior to retrofitting Rockport 2 with FGD scrubbers. These are "refueling" or "repowering" the Facility. *Id.*) By conditionally prohibiting operation of Rockport 2 as a power plant from 2026 (or 2029) through the end of its current projected economic useful life approximately $20-25$ years later, the Operating Restriction threatens the viability of Rockport 2 for fully the last third of its economic useful life, and in any event substantially impairs the pre-existing residual value of the Facility by requiring very substantial financial investment by Plaintiffs to realize it.

26

       d.      In the Modification, the Environmental Action Defendants also agreed to impose emission limits on Rockport 2 that are stricter than those otherwise imposed by law.  The Environmental Action Defendants agreed that:  (i) Rockport 2 would meet 30-day rolling average $NO_x$ and $SO_2$ emissions limits (the "Rockport 2 Emissions Limits") (*id.* ¶ 7 (modifying Consent Decree ¶ 56), ¶ 9 (modifying Consent Decree ¶ 87); and (ii) Rockport 1 and Rockport 2, together, would emit no more than 28,000 tons per year of $SO_2$ in 2016-17, with that limit to decline periodically until it reaches 22,000 tons per year at the end of the Basic Lease Term, and reaches 10,000 tons per year on January 1, 2029 (the "Rockport Plant Emissions Cap") (*id.* ¶ 10, adding ¶ 89A to the Consent Decree).  The Rockport 2 Emissions Limits and the Rockport Plant Emissions Cap constrain the otherwise lawful operation of Rockport 2 both before and after the end of the Basic Lease Term.  The Rockport Plant Emissions Cap also subjects Rockport 2 to emissions limits in combination with Rockport 1—such that Rockport 2's operating capacity might be adversely affected by Rockport 1's operations.

       e.      The Modification also cut the AEP System Emissions Cap for $SO_2$ (which indirectly limits permissible emissions from the Facility) almost in half, to 110,000 tons per year by the end of the Basic Lease Term, falling to 94,000 tons per year by 2029. *Id.* ¶ 8, modifying Consent Decree ¶ 86.

       f.      The Defendants notified the Trusts (through the Owner Participants) of their intention to modify the Consent Decree only after the fact.  Defendants indicated in a February 22, 2013 notice letter that the Environmental Action Defendants and the other parties to the Environmental Actions had already negotiated and executed the Modification, and had already moved (together with the Environmental Action Plaintiffs)

for its approval by the Ohio federal court.  The Modification itself provided that all parties would continue to support it unless and until the United States Government withdrew its support for entry of the order modifying the Consent Decree.  Defendants never notified the Trusts or the Owner Participants (nor publicly disclosed) that they were interested in obtaining the Modification until after the ink was already dry on their commitment to do so.

g.      The Ohio court entered the Modification "for the reasons set forth within . . . [the parties'] motion," and in precisely the form they had proposed, on May 14, 2013. *Id.*, at p. 2.

h.      The Defendants have made it clear they will do nothing in the next several years to arrange for compliance with the Operating Restriction—and that they will reserve the right not to do so at all.  Nor have the Defendants undertaken to protect the Trusts against any financial impact arising from curtailment of operations, remedial measures necessary to avoid curtailment, and/or fines, penalties or losses arising from noncompliance with the Rockport 2 Emissions Limits, the Rockport Plant Emissions Cap or the AEP System Emissions Caps (collectively, the "CD Emissions Caps").

*The Breaches*

34.      The Trusts' Complaint arises solely from private contractual promises the Defendants made not to encumber the Facility, not to shorten the economic useful life of the Facility, and to deal fairly and in good faith to protect the Trusts' economic interests as owners of the leased Facility.  Accordingly, and as set forth below, the Complaint does not seek to disturb or modify the Consent Decree or the Modification; instead, Plaintiffs seek to require the

Defendants to perform their preexisting contractual promises to Plaintiffs, consistently with the terms of the Consent Decree.

35.     The Operating Restriction constitutes an encumbrance and a restrictive covenant/negative easement—and therefore a Lien—on Rockport 2 under Section 7 of the Facility Lease because the Operating Restriction:  (a) restricts otherwise lawful use (i) of the Rockport 2 Site by the Defendants as its owner, and of Rockport 2 by the Defendants as Lessees who participate in its operation, and (ii) of the Rockport 2 Site Interest by the Trusts as ground lessees and as owner of Rockport 2—in each case unless they comply with extraordinary conditions on the way in which they can use Rockport 2; and (b) constitutes a binding constraint and limit on the conveyance of title to the Rockport 2 Site, or of a leasehold interest in Rockport 2, by Defendants.  I&M breached Section 7 of the Facility Lease by creating and/or incurring this prohibited Lien.  Each Defendant has also breached Section 7 of the Facility Lease by suffering this Lien to exist, and by failing to discharge the Lien or satisfy the conditions for its discharge.

36.     The Operating Restriction is not a "Permitted Lien" within the meaning of Section 7 of the Facility Lease because, *inter alia*, it does not arise from the exercise by any Governmental authority of reserved or vested power to impose the Operating Restriction or any Emissions Cap affecting Rockport 2 on Defendants.  Instead, these encumbrances and limitations were effected through Defendants' own active collaboration and consent.

37.     Defendants' actions create—but do not satisfy—a binding legal obligation to make and fund substantial Modifications to Rockport 2 or to shut the plant down substantially before the end of the economic useful life it would otherwise enjoy.  Defendants' actions also create a functional limit on Rockport 2's operations beyond the Lease Term.  The Defendants' actions accordingly violate:

a.     each Defendant's covenant under Section 6.01(j) of the Participation Agreement (and therefore Section 20 of the Facility Lease): (i) to take no action that would materially adversely affect the economic interests of the Trusts as holders of the Undivided Interests; and (ii) to take such action as might be necessary to avoid such consequences; and

b.     each Defendant's implied covenant under the Facility Lease to deal fairly and in good faith with the Trusts as Lessors and not to exercise their discretion to act in a manner that undermines the value of the Trusts' residual interests.

38.     Defendants' actions also create a future liability, cost and/or obligation affecting the Trusts with respect to Rockport 2 by reason of the CD Emissions Caps and the Allowance Surrender Obligation of the Consent Decree.

39.     Through each of these breaches of covenants they made under the Facility Lease and/or the Participation Agreement, each Defendant has injured each of the Trusts in amounts greatly exceeding, in each case, $75,000.  These injuries arise from the incurrence of approximately $1.4 billion worth of unfunded future obligations that must be satisfied in order to avoid premature retirement of Rockport 2; the incurrence of other potential operating constraints, obligations and/or liabilities arising from the CD Emissions Caps and the Allowance Surrender Obligation; and a corresponding present diminution in the value of each Trust's Undivided Interest in Rockport 2.

40.     The harm Defendants' foregoing actions have caused and will cause to the Trusts is irreparable, because it affects Rockport 2 in ways that constrain and limit future operation of the Facility, with far-reaching consequences that cannot be fully compensated by an award of damages.

## CLAIMS FOR RELIEF BY EACH PLAINTIFF AGAINST EACH DEFENDANT

### COUNT I
### Breach Of Contract (Facility Lease)

41.     The Trusts repeat and re-allege the allegations of paragraphs 1-40, above, as if fully set forth herein.

42.     Each Facility Lease is a valid and binding contract to which a Trust on the one hand, and a Defendant on the other hand, are party.

43.     Each of the Defendants has breached the Facility Lease with each of the Trusts by the above-described actions of the Defendants.

44.     Each Trust has at all times complied with any and all obligations of performance it must meet in order to enforce the promises set forth by each Defendant in the Facility Lease.

45.     As a direct, proximate and foreseeable result of each Defendant's breach of each Facility Lease, each Trust has suffered and will suffer irreparable harm, which is not fully compensable by remedies at law, and injury and damages greatly exceeding $75,000.

### COUNT II
### Breach of Contract (Participation Agreement)

46.     The Trusts repeat and re-allege the allegations of paragraphs 1-45, above, as if fully set forth herein.

47.     Each Participation Agreement is a valid and binding contract to which a Trust on the one hand, and a Defendant on the other hand, are party.

48.     Each of the Defendants has breached the Participation Agreement with each of the Trusts by the above-described actions of the Defendants.

49.     Each Trust has at all times complied with any and all obligations of performance it must meet in order to enforce the promises set forth by each Defendant in the Participation Agreement.

50.     As a direct, proximate and foreseeable result of each Defendant's breach of the Participation Agreement, each Trust has suffered and will suffer irreparable harm, which is not fully compensable by remedies at law, and injury and damages greatly exceeding $75,000.

<div align="center">

**COUNT III**
**Breach Of The Covenant Of Good Faith And Fair Dealing**

</div>

51.     The Trusts repeat and re-allege the allegations of paragraphs 1-50, above, as if fully set forth herein.

52.     Under New York law, a covenant of good faith and fair dealing is implied by law in every contract (including the Facility Lease and the Participation Agreement), to protect the reasonable expectations of the parties and to protect them against their counterparty's evasion of the spirit and purpose of the agreement.

53.     Each of the Defendants has breached the covenant of good faith and fair dealing under the Facility Lease and the Participation Agreement against each of the Trusts by their above-described actions.

54.     Each Defendant's above-described actions defeat the reasonable expectations for which each Trust bargained in the Transaction Documents, and evades the spirit and purpose of the Facility Lease and the Participation Agreement.

55.     As a direct, proximate and foreseeable result of each Defendant's breach of the covenant of good faith and fair dealing in each of the Facility Lease and the Participation Agreement, each Trust has suffered and will suffer irreparable harm, which is not fully compensable by remedies at law, and injury and damages greatly exceeding $75,000.

## COUNT IV
## Indemnification

56.     The Trusts repeat and re-allege the allegations of paragraphs 1-55, above, as if fully set forth herein.

57.     Under the Participation Agreement, each Defendant agreed to indemnify each Trust (among others) against obligations and liabilities arising from actions of the Defendants that create them with respect to Rockport 2.  The foregoing actions of Defendants expose each Trust to the prospect of a future liability for, or obligation with respect to:  (a) surrender of $NO_x$ and $SO_2$ Allowances they would otherwise be entitled to keep but for the Allowance Surrender Obligation, and/or to pay substantial fines and/or penalties for failure to do so; and (b) potential penalties, fines or incurrence of expenses to avoid one or more of the CD Emissions Caps.

58.     Defendants have refused and/or failed to acknowledge any obligation to indemnify the Trusts for such "Expenses" (within the meaning of the Participation Agreement) in connection with these prospective obligations and liabilities.

59.     As a direct, proximate and foreseeable result of each Defendant's actions, each Trust has suffered and will suffer irreparable harm, which is not fully compensable for remedies at law, and injury and damages greatly exceeding $75,000.

## PRAYER FOR RELIEF

WHEREFORE, each of the Trusts requests the following relief:

1.     Entry of judgment in favor of the Trustee of each of the Trusts and against each of the Defendants, declaring:

a.     that each Defendant's actions complained of herein constitute a breach of the Facility Lease, the Participation Agreement, and the covenant of good faith and fair

dealing implied into both of these contracts, by each Defendant against each Plaintiff herein;

      b.    that each Defendant's agreement or assent to the Scrubber Mandate and the Operating Restriction, by such Defendant's agreement or assent to the Consent Decree and to the Modification including such provisions, constituted the creation and incurrence by such Defendant of a prohibited Lien under Section 7 of each Facility Lease;

      c.    that each Defendant's failure to discharge the prohibited Lien by proceeding, at its own sole expense, to install FGD scrubbers at Rockport 2 (or otherwise) is a breach of Section 7 of the Facility Lease;

      d.    that each Defendant's actions as set forth above breach their covenants not to curtail the economic useful life and/or the total generating capability of Rockport 2 and thereby damage the Undivided Interest of each Trust in Rockport 2;

      e.    that each Defendant's actions as set forth above breach the reasonable expectations of each Trust with respect to each Defendant's management and operation of Rockport 2 as Lessee; and

      f.    that each Trust is entitled to be held harmless from each Defendant's breaches by each Defendant, jointly and severally, such that each Trust is entitled to (i) Defendants' satisfaction of the Operating Restriction to protect the residual value of the Facility by installation of FGD scrubbers (or otherwise) at Defendants' sole expense; (ii) full compensation from Defendants (jointly and severally) to the Trusts for any future loss of profits from, or costs incurred to avoid, curtailment of operations at Rockport 2 caused by any CD Emissions Cap and/or the Allowance Surrender Requirement, as well

34

as any fines, penalties or other liabilities arising from any of the foregoing; and/or

(iii) damages compensating each of the Plaintiffs for any loss incurred by reason of either

Defendant's failure to satisfy any of the foregoing obligations;

2.      An order enjoining the Defendants to render specific performance of these

foregoing contract obligations by using all best efforts to discharge the Operating Restriction by

installing FGD scrubbers that comply with the Operating Restriction of the Consent Decree (or

otherwise), and retaining jurisdiction to award damages against the Defendants (jointly and

severally) for any failure by the Defendants to complete such efforts successfully;

3.      An award of compensatory damages in favor of each of the Trusts against each of

the Defendants in an amount greater than $75,000 to be proved at trial, which will include without

limitation the Trusts' attorney's fees and costs incurred in connection with this action; and

4.      Such other and further relief as the Court deems just and proper.


Dated:  July 26, 2013                          Respectfully submitted,


OF COUNSEL:                                    Thomas J. Giblin
                                               LATHAM & WATKINS LLP
Edward J. Shapiro                              885 Third Avenue
Drew Ensign                                    New York, New York  10022-4834
LATHAM & WATKINS LLP                           (212) 906-1200
555 Eleventh Street, N.W., Suite 1000          thomas.giblin@lw.com
Washington, D.C.  20004-1304
(202) 637-2200                                 *Counsel for Plaintiff Wilmington Trust*
edward.shapiro@lw.com                          *Company, in its capacity as Owner Trustee of*
drew.ensign@lw.com                             *each of AEGCO Trust 1, AEGCO Trust 2,*
                                               *AEGCO Trust 5, I&M Trust 1, I&M Trust 2,*
                                               *and I&M Trust 5*