UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**WILMINGTON TRUST COMPANY,**
et al.,

    **Plaintiffs,**

               **Case No. 2:13-cv-1213**
   v.          **CHIEF JUDGE EDMUND A. SARGUS, JR.**
               **Magistrate Judge Terence P. Kemp**

**AEP GENERATING COMPANY,**
et al.,

    **Defendants.**

## OPINION AND ORDER

   This matter is before the Court for consideration of several motions filed by Plaintiffs

(various trusts represented by the Wilmington Trust Company in its capacity as owner trustee)

(collectively, "Plaintiffs") and Defendants AEP Generating Company and Indiana Michigan

Power Company (collectively, "Defendants"). For the reasons stated below, Defendants' Motion

for Partial Judgment on the Pleadings [ECF No. 88] and Second Motion to Dismiss [ECF No.

131] are **GRANTED**; Plaintiffs' Motion for Partial Summary Judgment [ECF No. 123] and

Motion for Leave to File a Surreply [ECF No. 197] are **DENIED**; and Plaintiffs' Motion for

Leave to File a Second Amended Complaint [ECF No. 127] and Defendants' Omnibus Motion

for an Extension, for a Stay, and to Strike [ECF No. 106] are **DENIED AS MOOT**.

## I.  BACKGROUND

**A.  Relevant Facts**

   The Court has already provided an extensive explanation of the facts and agreements

underlying this case. (Jan. 13, 2015 Op. & Order at 1–8 [ECF No. 73].) The Court will provide

an overview here.

In the 1980s, Defendants developed an electricity generating plant near Rockport, Indiana consisting of two large, coal-fired units: Rockport 1, which was completed in 1984, and Rockport 2 (also referred to as "Unit 2"), which was completed in 1989. (First Am. Compl. ¶ 6 [ECF No. 121].) Soon after the plant's completion, Defendants completed a prearranged sale of Rockport 2 to a group of investor-financed trusts, which subsequently leased the unit back to Defendants for operation. Plaintiffs are a subset of the trusts that own Rockport 2. (*Id.* ¶¶ 8–9.) Upon completion, Rockport 2 had an estimated economic useful life of 45 to 60 years. (*Id.* ¶ 1.)

The sale and leaseback transaction was memorialized by a series of agreements entered into between each trust and each of the Defendants. These agreements include the Participation Agreement, which established the overall framework of the transaction; a bill of sale, which effected the sale of Defendants' ownership interests in Rockport 2 to the trusts; the Ground Lease and Easement Agreement, whereby Defendants leased the land underlying Rockport 2 to the trusts for an initial term of 44 years, 4 months that may be renewed at the option of the trusts for the entire economic useful life of Rockport 2; the Facility Lease, whereby the trusts leased Rockport 2 back to Defendants for an initial period commencing on December 7, 1989 and ending December 7, 2022; and the Operating Agreement, which provides for the operation of Rockport 2 following the Termination of the Facility Lease. (*Id.* ¶ 18.)

In 1999, 2004, and 2005, Defendants Indiana Michigan Power Company and affiliates of it and Defendant AEP Generating Company were sued by the United States Environmental Protection Agency, several States, and private organizations for alleged violations of the Clean Air Act. (*Id.* ¶ 24.) The litigation did not involve violations of the Clean Air Act at Rockport 2 and Plaintiffs were not parties to any of the cases. (*Id.* ¶ 25.) The litigation was eventually

2

consolidated in this Court and settled by a consent decree (the "Consent Decree") in 2007. (*Id.* ¶ 27.)

Under the original terms of the Consent Decree, Defendants agreed to install a "Selective Catalytic Reduction System"—technology designed to reduce nitrogen oxide emissions—at Rockport 2 by December 31, 2019. (Consent Decree ¶ 68 [ECF No. 121-3].) The Consent Decree also required Defendants to install a "Flue Gas Desulfurization System" (a "scrubber")—technology designed to reduce sulfur dioxide emissions—by the same date. (*Id.* ¶ 87.) The Consent Decree also imposes certain limitations and restrictions that apply to Defendants and their affiliates' larger system of electricity-generating units and could impact the operation of Rockport 2. (*See id.* ¶¶ 74, 76, 77, 79, 86, 93.)

The Consent Decree may be materially modified only with the written agreement of the parties thereto and the approval of the Court; three modifications have thus far been made. (*Id.* ¶ 199.) On May 14, 2013, the Court approved and docketed the third modification to the Consent Decree (the "2013 Modification"), which altered the compliance requirements for Rockport 2. *See United States v. Am. Elec. Power & Serv. Corp.*, Case No. 2:99-cv-1182, ECF No. 548 (S.D. Ohio May 14, 2013). Specifically, the 2013 Modification amended ¶ 87 of the Consent Decree to require Defendants to install "Dry Sorbent Injection" technology at both Rockport units by April 16, 2015 and give Defendants the option to "Retrofit, Retire, Re-power, or Refuel" Rockport 2 by December 31, 2028. (2013 Modification ¶ 9 [ECF No. 121-4].) The parties could "retrofit" Rockport 2 by, in part, installing scrubber technology. (*Id.* ¶ 7.) Thus, the 2013 Modification adjusts the potential compliance date for the installation of a scrubber at Rockport 2 from 2019 to 2028, a date beyond the original period of the Facility Lease (set to expire in 2022), and gives Defendants the option to permanently close Rockport 2 by that date. Additionally, the 2013

Modification establishes specific sulfur dioxide emission caps applicable to both Rockport units starting in 2016 and imposes stricter, system-wide sulfur dioxide emission limitations. (*Id.* ¶¶ 8, 10.)

**B.    Procedural History**

Plaintiffs initiated this suit on July 26, 2013. (Compl. at 1 [ECF No. 1].) Plaintiffs asserted claims for breach of the Facility Lease (Count I), breach of the Participation Agreement (Count II), breach of the implied covenant of good faith and fair dealing (Count III), and indemnification (Count IV). (*Id.* ¶¶ 41–59.) Plaintiffs supplemented their original Complaint on August 20, 2014 with a breach of contract claim under Facility Lease § 8(b) (Count V). (*See generally* Supplemental Compl. [ECF No. 69].) Count V accrued during litigation as a result of Defendants' alleged refusal to share certain documents with Plaintiffs. (*See id.* at 2.) Plaintiffs filed a First Amended Complaint [ECF No. 121] on October 2, 2015. In their First Amended Complaint, Plaintiffs added language to clarify that their breach of contract claims (Counts I and II) encompass violations of Defendants' obligations of Applicable Law or Governmental Actions under § 8 of the Facility Lease. (First Am. Compl. ¶ 37(c).) The remainder of the Complaint stayed the same. (*See generally id.*) Plaintiffs moved to file a Second Amended Complaint on October 7, 2015. Plaintiffs seek to clarify through their Second Amended Complaint that their claim for breach of the Facility Lease (Count I) encompasses Defendants' purported violation of the Facility Lease's "Prudent Utility Practice" obligation. (Pls.' Mem. in Supp. of Mot. for Leave to File Second Am. Compl. at 1 [ECF No. 128].)

Defendants moved to dismiss the original Complaint on October 15, 2013. (Defs.' First Mot. to Dismiss at 2 [ECF No. 13].) In its January 13, 2015 Opinion and Order, the Court granted in part and denied in part the First Motion to Dismiss. (Jan. 13, 2015 Op. & Order at 27

4

[ECF No. 73].) The Court dismissed without prejudice as non-justiciable Plaintiffs' claims seeking compensatory damages for compliance with the terms of the Consent Decree related to the installation of emission-control technology at Rockport 2. (*Id.*) To the extent that the Complaint asserted claims that Defendants breached the Facility Lease on the grounds that the Consent Decree is not a "Permitted Lien," those claims were dismissed with prejudice. (*Id.*) Lastly, the Court dismissed a portion of Plaintiffs' indemnification claim. (*Id.*)

To summarize, Plaintiffs currently have six claims before the Court: (1) a good faith and fair dealing claim; (2) an indemnification claim; (3) a document inspection claim; and three breach of contract claims encompassed within Counts I and II of the First Amended Complaint. Defendants allegedly breached (4) their obligation under § 6.01(j) of the Participation Agreement and § 20 of the Facility Lease to take no action that would materially adversely affect Rockport 2 (the "§ 6.01(j) claim"), (5) their obligations of Applicable Law or Governmental Actions under § 8 of the Facility Lease (the "§ 8 claim"), and, as explained below, (6) their obligation under § 8(a) of the Facility Lease to operate Rockport 2 in accordance with Prudent Utility Practice (the "Prudent Utility Practice claim").

On June 4, 2014, Defendants moved for partial judgment on the pleadings [ECF No. 88] on Plaintiffs' § 6.01(j) and indemnification claims. Plaintiffs filed their Motion for Partial Summary Judgment [ECF No. 123] on October 2, 2015. Plaintiffs seek summary judgment on their § 6.01(j) and § 8 claims. Defendants filed their Motion to Dismiss the First Amended Complaint ("Second Motion to Dismiss") [ECF No. 131] on October 22, 2015. Defendants request dismissal of Plaintiffs' § 6.01(j), § 8, indemnification, and good faith and fair dealing

claims. Lastly, Plaintiffs have moved for leave to file a surreply [ECF No. 197] in response to Defendants' Reply in Support of their Second Motion to Dismiss [ECF No. 194].[1]

Before addressing the parties' dispositive motions, the Court will first consider several preliminary matters: Plaintiffs' Motion for Leave to File a Second Amended Complaint; the timing of Defendants' Second Motion to Dismiss; and Plaintiffs' Motion for Leave to File a Surreply.

## II.   MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

Plaintiffs have moved for leave to file a Second Amended Complaint [ECF No. 127]. Plaintiffs seek to add an "express reference to the operative language of Section 8(a) of the Facility Lease that Defendants violated their obligation to 'operate, service, maintain and repair Unit 2 . . . in accordance with . . . Prudent Utility Practice.'" (Pls.' Mem. in Supp. of Mot. for Leave to File Second Am. Compl. at 1 [ECF No. 128].) Plaintiffs contend that filing their Second Amended Complaint is proper under Federal Rule of Civil Procedure 15(a). (*See id.*) Alternatively, Plaintiffs assert that they do not actually need to amend their Complaint in order to bring their Prudent Utility Practice claim because that claim "is already within the scope of [their] original [C]omplaint." (*See id.*)

Defendants oppose Plaintiffs' Motion for Leave to File a Second Amended Complaint. The motion fails, they argue, because Plaintiffs cannot meet the requirements of Federal Rules

---

[1] On August 6, 2015, Defendants filed an Omnibus Motion for an Extension, for a Stay, and to Strike [ECF No. 106]. Defendants' Omnibus Motion seeks (i) additional time to respond to a motion for summary judgment, (ii) an order mandating Plaintiffs' response to certain discovery requests involving information relevant to Plaintiffs' § 8 claim, and (iii) the removal/dismissal of portions of the motion for summary judgment dealing with the § 8 claim. Defendants' Omnibus Motion is now moot. Plaintiffs have since withdrawn their first motion for summary judgment, (*see* Nov. 2, 2015 Stipulated Order at 1–2 [ECF No. 133] (withdrawing as moot Plaintiffs' First Motion for Partial Summary Judgment [ECF No. 93])), and in the present Opinion and Order, the Court denies Plaintiffs' current Motion for Partial Summary Judgment. With respect to Defendants' motion to strike, Defendants consented to Plaintiffs filing their First Amended Complaint, which clarifies that Plaintiffs' breach of contract claims encompass their claim under § 8 of the Facility Lease. (*See* Defs.' Omnibus Mot. at 20 n.4.)

15 and 16. (Defs.' Mem. in Opp'n to Mot. for Leave to File Second Am. Compl. at 1 [ECF No. 134].) As to Plaintiffs' alternative argument, Defendants assert that the Prudent Utility Practice claim was not pleaded or encompassed in the original Complaint. (*See id.* at 3–4, 8–9 & n.4.)

The Court agrees with Plaintiffs—the First Amended Complaint already encompasses a Prudent Utility Practices claim.

Under Federal Rule of Civil Procedure 8(a), a complaint need only set forth a short and plain statement of the claim showing that the plaintiff is entitled to relief. *See* Fed. R. Civ. P. 8(a). To meet this standard, a complaint must contain sufficient factual allegations to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint will not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). To state a claim for breach of contract under New York law, a complaint must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).

Here, Plaintiffs' First Amended Complaint alleges sufficient facts to plead a plausible breach of contract claim as to the Facility Lease.[2] Plaintiffs plead the existence of a contract. (*See, e.g.*, First Am. Compl. ¶¶ 9–10, 17–18 [ECF No. 121].) They plead adequate performance on their part. (*See, e.g.*, *id.* ¶ 44.) They plead a breach of the contract. (*See, e.g.*, *id.* ¶¶ 32–38.) And they plead the existence of damages. (*See, e.g.*, *id.* ¶¶ 38–40, 45.) The question remaining is

---

[2] Whether Plaintiffs' breach of contract claims regarding the Facility Lease and the Participation Agreement survive as a matter of law following a review of the relevant contract language is a different matter that the Court addresses, in part, in the present Opinion and Order.

whether Plaintiffs' breach of contract claim encompasses the theory that Defendants violated the Prudent Utility Practice provision found in § 8(a) of the Facility Lease.

In their First Amended Complaint, Plaintiffs explicitly allege that Defendants violated § 8(a) of the Facility Lease. (First Am. Compl. ¶ 37(c) ("Defendants' actions . . . violate: . . . [e]ach Defendant's covenant under Sections 8(a), (c) and (h) of the Facility Lease, by *inter alia* . . . .")). And, more generally, Plaintiffs make several allegations from which the Court can plausibly infer that Defendants' actions may have impaired the operating efficiency of Rockport 2 and, thus, that Defendants failed to maintain Rockport 2 in accordance with Prudent Utility Practice. (*See, e.g.*, First Am. Compl. ¶ 33 (I&M "agreed to accept an $SO_2$ emissions cap applicable to Rockport 1 and Rockport 2 (collectively) both before and after the installation of such scrubbers, thereby creating a highly burdensome restriction on the otherwise lawful operation of Rockport 2 after 2025.") ("By conditionally prohibiting operation of Rockport 2 as a power plant from 2026 (or 2029) through the end of its current projected economic useful life approximately $20 - 25$ years later, the Operating Restriction threatens the viability of Rockport 2 for fully the last third of its economic useful life . . . .") ("In the Modification, the Environmental Action Defendants also agreed to impose emission limits on Rockport 2 that are stricter than those otherwise imposed by law.") ("The Defendants have made it clear that they will do nothing in the next several years to arrange for compliance with the Operating Restriction—and that they will reserve the right not to do so at all.").) These allegations satisfy Federal Rule 8(a) and the plausibility pleading standard outlined in *Twombly* and *Iqbal*. *See also Worthington Cylinder Corp. v. Schrader-Bridgeport Int'l, Inc.*, No. 2:12-cv-554, 2014 WL 1330062, at *3–5 (S.D. Ohio Apr. 1, 2014) (holding that a plaintiff need not "plead all [of the] precise theories underlying a claim" in order to assert those theories later in litigation); *Dhillon v. Cleveland*

8

*Clinic Found.*, No. 5:07CV3505, 2009 WL 901870, at *3 (N.D. Ohio Mar. 31, 2009) (holding

that the plaintiff "stated a claim for breach of contract by referring to provisions allegedly

breached and making some attempt to be" specific with the claim); *Webb v. Chase Manhattan*

*Mortg. Corp.*, No. 2:05-cv-0548, 2007 WL 709335, at *5–6 (S.D. Ohio Mar. 5, 2007) (holding

that the plaintiffs adequately pleaded a breach of contract claim even though the plaintiffs failed

"to allege what specific provisions of what contract(s) [the defendant] allegedly breached").[3]

Given that the First Amended Complaint already encompasses Plaintiffs' Prudent Utility

Practice claim/theory, Plaintiffs need not amend their Complaint in order to assert that claim

against Defendants at trial (or through summary judgment). Accordingly, the Court denies as

moot Plaintiffs' Motion for Leave to File a Second Amended Complaint [ECF No. 127].[4] The

parties should work diligently to complete any discovery related to this claim; the Court is

concerned that this litigation has already continued longer than necessary.

### III.  TIMELINESS OF THE MOTION TO DISMISS

Plaintiffs object, as a threshold matter, to the timing of Defendants' Second Motion to

Dismiss [ECF No. 131]. (Pls.' Mem. in Opp'n to Second Mot. to Dismiss at 6 [ECF No. 172].)

Plaintiffs assert that Defendants should have challenged the § 6.01(j), indemnification, and good

faith and fair dealing claims in their First Motion to Dismiss [ECF No. 13]. (*Id.*) Those claims

did not change when Plaintiffs filed their First Amended Complaint [ECF No. 121]. (*Id.* at 6–7.)

---

[3] Defendants point to a chart within Plaintiffs' Status Conference Memorandum [ECF No. 75] as proof
that the Complaint does not encompass a Prudent Utilities Practice claim. (Defs.' Mem. in Opp'n to Mot.
for Leave to File Second Am. Compl. at 3–4.) The chart, however, does not alter the facts that Plaintiffs
alleged in their Complaint. And, in any event, the chart indicated that a claim for breach of the Facility
Lease still remained in the case. (*Id.* at 4 (listing under Count II of the chart: "Breach of Participation
Agreement and Facility Lease").)
[4] Because the Court has denied Plaintiffs' Motion for Leave to File a Second Amended Complaint, the
Court finds it unnecessary to address Defendants' arguments under Federal Rules 15 and 16 in opposition
to the amendment.

The First Amended Complaint simply added a reference to Plaintiffs' § 8 claim. (*Id.*)[5]

Defendants dispute this timeliness objection. Defendants point to an alleged agreement that the parties struck during a status conference. Following the status conference, the parties filed a joint stipulation stating, among other things, that "Plaintiffs' motion (1) to strike or stay Defendants' motion to dismiss (in part) and (2) for a scheduling order concerning the remainder of the motion to dismiss and pending related motions (Doc. 135) is withdrawn as moot." (Nov. 25, 2015 Stipulation at 1 [ECF No. 149].) By filing this stipulation, Plaintiffs allegedly waived their timeliness objection to Defendants' Second Motion to Dismiss. (Defs.' Reply in Supp. of Second Mot. to Dismiss at 4–5 [ECF No. 194].) Defendants also contend that their arguments are properly before the Court via their Motion for Partial Judgment on the Pleadings [ECF No. 88] irrespective of whether those arguments are timely asserted in their Second Motion to Dismiss.

Federal Rule of Civil Procedure 12(g) "'generally precludes a second motion based on any Rule 12 defense or objection that the defendant could have but neglected to raise in the original motion.'" *Williamson v. Recovery Ltd. P'ship*, No. 06-cv-292, 2009 WL 3172648, at *3 (S.D. Ohio Sept. 30, 2009) (quoting 5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1385). "'[T]he filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in a timely fashion prior to the amendment of the pleading.'" *Id.* (quoting Wright & Miller § 1388). Rule 12(g) provides for several exceptions though. Those exceptions are outlined in Rule 12(h)(2). Fed. R. Civ. P. 12(g). Rule 12(g) does not prohibit a party from bringing "[a] defense of failure to state a claim upon which relief can be granted . . . in any pleading permitted or ordered under Rule 7(a), or by motion for judgment on the pleadings, or at the trial on the merits." Fed. R. Civ. P. 12(h)(2).

---

[5] Plaintiffs do not object to the timeliness of Defendants' motion to dismiss the § 8 claim.

Defendants' arguments to dismiss the § 6.01(j) and indemnification claims are properly before the Court. Defendants asserted those arguments in their Motion for Partial Judgment on the Pleadings, which, as a 12(c) motion asserting a failure to state a claim defense, is excluded from Rule 12(g)'s general mandate to consolidate pre-answer motions. *See Simmons v. Med. Coll. of Ohio*, No. 3:04 CV 7227, 2004 WL 2713082, at *2 (N.D. Ohio Nov. 23, 2004).[6]

Although Plaintiffs pleaded a good faith and fair dealing claim in their original Complaint, Defendants did not adequately move to dismiss that claim in their First Motion to Dismiss. (Jan. 13, 2015 Op. & Order at 25 & n.5 [ECF No. 73].) Defendants did not move to dismiss that claim through their Motion for Partial Judgment on the Pleadings either. (*See generally* Defs.' Mot. for Partial J. on the Pl'gs.) The Court will, nonetheless, consider Defendants' current motion to dismiss the good faith and fair dealing claim. The Court has not observed anything in the procedural history of this case to suggest that Defendants waited to challenge this claim for the purpose of delaying the case or for some other improper reason. *See Adams v. Tennessee*, No. 3:04-cv-00346, 2011 WL 3236609, at *2–3 (M.D. Tenn. July 29, 2011) (observing that Rule 12(g) "was drafted by the Advisory Committee to prevent the dilatory motion practice fostered by common law procedure and many of the codes whereby numerous pretrial motions could be made, . . . a course of conduct that often was pursued for the sole

---

[6] Defendants' Motion for Partial Judgment on the Pleadings is directed toward Plaintiffs' original Complaint. Normally, the filing of an amended complaint would render a motion to dismiss or motion for judgment on the pleadings moot. *Grisby v. Wilberforce Univ.*, No. 3:10-cv-00184, 2011 WL 3321292, at *1 (S.D. Ohio July 15, 2011). This normal rule does not apply, however, if "the deficiencies cited in the motion to dismiss exist in the most recent amended complaint." *Id.* Here, the First Amended Complaint does not alter the portions of the original Complaint dealing with the § 6.01(j) and indemnification claims. As such, the First Amended Complaint does not moot Defendants' Motion for Partial Judgment on the Pleadings. The Court considers that motion as if it were directed at the First Amended Complaint. *See Yates v. Applied Performance Techs., Inc.*, 205 F.R.D. 497, 499–500 (S.D. Ohio 2002) ("'If some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading.'" (quoting 6 Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 1476 (2d ed. 1990))).

11

purpose of delay"). Moreover, addressing Defendants' arguments here will expedite the resolution of this case and obviate the need for the parties to duplicate their briefing on the good faith and fair dealing claim in a subsequent motion for judgment on the pleadings or motion for summary judgment. *See id.* at \*3 (exercising the court's "discretion to entertain [a] successive motion [to dismiss]" where the motion was not filed for purposes of delay and where addressing the motion would expedite the final disposition of the case); *Davis v. City of Dearborn*, No. 2:09-CV-14892, 2010 WL 3476242, at \*4–5 (E.D. Mich. Sept. 2, 2010) (same); *Zarwell v. King & Nordlinger, L.L.P.*, No. 05-1938, 2006 WL 5503909, at \*1 n.1 (D. Md. June 6, 2006) (same); *SCO Grp, Inc. v. Novell, Inc.*, 377 F. Supp. 2d 1145, 1151 (D. Utah 2005) (same); *Thorn v. N.Y.C. Dep't of Soc. Servs.*, 523 F. Supp. 1193, 1196 n.1 (S.D.N.Y. 1981) (same); *see also Overton v. Wyeth, Inc.*, No. CA 10-0491, 2011 WL 1343392, at \*5 (S.D. Ala. Mar. 15, 2011) (considering a potentially untimely motion to dismiss where it was clear that the plaintiff could not state a claim and that "the substance of [the] motion [would] only be reurged at a later stage in [the] proceeding").

In sum, Plaintiffs' timeliness objection is not well taken. Defendants' arguments for dismissing the § 6.01(j), indemnification, and good faith and fair dealing claims are all properly before the Court.

### IV.  MOTION TO FILE SURREPLY

As an additional preliminary matter, Plaintiffs request leave to file a surreply [ECF No. 197] to address two arguments raised in Defendants' Reply in Support of their Second Motion to Dismiss [ECF No. 194]. The proposed surreply addresses (1) Defendants' assertion that Plaintiffs agreed to waive their timeliness objection to the Second Motion to Dismiss and (2) Defendants' citation in their Reply to new legal authority that is purportedly controlling with

respect to Plaintiffs' good faith and fair dealing claim. (Pls.' Mot. for Leave to File Surreply at 1–2 [ECF No. 197].)

Plaintiffs' Motion for Leave to File a Surreply is denied. The Court has already determined, on grounds other than Plaintiffs' purported waiver, that Plaintiffs' timeliness argument fails. *See International-Matex Tank Terminals-Illinois v. Chem. Bank*, No. 1:08-cv-1200, 2009 WL 1651291, at *3 (W.D. Mich. June 11, 2009) (denying a motion for leave to file a surreply where the court did not consider the arguments and theories purportedly raised for the first time in a reply brief). And Defendants' citation to new authority in support of a previously articulated argument—that the assertion of both a breach of contract claim and a good faith and fair dealing claim is redundant—does not warrant a surreply. *See Bishop v. Children's Ctr. for Developmental Enrichment*, No. 2:08-cv-766, 2011 WL 5506105, at *2 (S.D. Ohio Nov. 10, 2011) (denying a plaintiff's motion for leave to file a surreply because even though "Defendants relied upon several cases to which they had not previously cited, those cases were in support of arguments that had been previously made").

## V.   DISPOSITIVE MOTIONS

The parties have filed multiple dispositive motions. Defendants have moved to dismiss Plaintiffs' § 8, § 6.01(j), indemnification, and good faith and fair dealing claims. Plaintiffs, in turn, have moved for summary judgment on their § 8 and § 6.01(j) claims. The Court first analyzes each claim under a motion to dismiss standard.[7] Given that the Court dismisses Plaintiffs' § 8 and § 6.01(j) claims, the Court need not consider those claims under a motion for

---

[7] As noted below, the Court applies the same standard when considering motions to dismiss and motions for judgment on the pleadings.

summary judgment standard.[8]

## A.  Motion to Dismiss and Motion for Judgment on the Pleadings Standard

A court reviews a motion for judgment on the pleadings, brought under Federal Rule of Civil Procedure 12(c), in the same manner as a court would review a motion brought under Federal Rule 12(b)(6). *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir. 2006). Rule 12(b)(6) provides for dismissal of actions that fail to state a claim upon which relief can be granted. Generally, an action will be dismissed under this standard where "there is no law to support the claims made." *Stew Farm, Ltd. v. Natural Res. Conservation Serv.*, No. 2:12-cv-299, 2013 WL 4517825, at *3 (S.D. Ohio Aug. 26, 2013) (citing *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978)). The same holds where "the facts alleged are insufficient to state a claim." *Id.* Federal Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *See also Twombly*, 550 U.S. at 555. To meet this standard, a complaint must contain sufficient factual allegations to "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A complaint will not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). When considering a Rule 12(c) or 12(b)(6) motion, a court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. *See Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998).

---

[8] Although the Court analyzes the claims under a motion to dismiss standard, the Court will incorporate into that analysis any relevant arguments that Plaintiffs asserted in their Motion for Partial Summary Judgment.

**B.    Contract Interpretation Under New York Law**

Neither party disputes that the issues of contractual interpretation presently before the

Court are governed by the laws of New York. (*See* Facility Lease § 21(f) [ECF No. 121-2];

Participation Agreement § 11.07 [ECF No. 121-1].) Under New York law, contract interpretation

is a question of law for the Court to resolve. *Int'l Multifoods Corp. v. Commercial Union Ins.

Co.*, 309 F.3d 76, 83 (2d Cir. 2002); *see also Am. Auto. Ins. Co. v. Rest Assured Alarm Sys., Inc.*,

786 F. Supp. 2d 798, 803 (S.D.N.Y. 2011) ("Because contract interpretation is generally a

question of law, it is suitable for disposition on a motion to dismiss." (quotations omitted)). The

Court must first determine whether the contract is unambiguous with respect to the question

presented by the parties. Ambiguity is present

> where the terms of a contract could suggest more than one meaning when viewed
> objectively by a reasonably intelligent person who has examined the context of
> the entire integrated agreement and who is cognizant of the customs, practices,
> usages and terminology as generally understood in the particular trade or
> business. Ambiguity with respect to the meaning of contract terms can arise either
> from the language itself or from inferences that can be drawn from this language.
> Hence, only where the language and the inferences to be drawn from it are
> unambiguous may a district court construe a contract as a matter of law . . . .

*Alexander & Alexander Servs., Inc. v. Certain Underwriters, Lloyd's, London*, 136 F.3d 82, 86

(2d Cir. 1998) (quotations and citations omitted). "If the court finds that the contract is not

ambiguous it should assign the plain and ordinary meaning to each term and interpret the

contract without the aid of extrinsic evidence." *Id.*

**C.    Indemnification Claim**

In its January 13, 2015 Opinion and Order, the Court dismissed Plaintiffs'

indemnification claim to the extent that it sought "1) a declaration that Plaintiffs are entitled to

indemnification for 'Expenses' incurred in complying with the Consent Decree *after* the lease

term has expired; 2) a declaration that the plaintiffs are entitled to indemnification for a loss of

15

anticipated profits; and 3) a declaration that the Plaintiffs are entitled to indemnification for 'Expenses' related to a potential sale of their interests in Rockport 2." (Jan. 13, 2015 Op. & Order at 26 [ECF No. 73].) Thus, as the Court acknowledged, the Participation Agreement specifically excludes from its coverage

> any Expense imposed on, incurred by or asserted against any Indemnitee to the extent the same relates to or arises out of one or more of the following circumstances:
>
> . . . .
>
>> (6) acts or events that occur after the earlier of (x) the surrender of possession of the Undivided Interest and the Unit 2 Site Interest Pursuant to Section 5 of the Lease or (y) the expiration or termination of the Lease Term;
>>
>> (7) the offer or sale by or on behalf or for the account of any Indemnitee of any interest in the Trust Estate or the Trust Agreement or any similar interest.

(Participation Agreement § 7.01 [ECF No. 121-1].) As the Court also noted, the Participation Agreement defines "Expenses" as "liabilities, obligations, losses (excluding loss of anticipated profits), damages, claims, actions, suits, judgments, out-of-pocket costs, expenses and disbursements (including legal fees and expenses) of any kind and nature whatsoever." (*Id.*, App. A at 6.)

Defendants now move to further dismiss Plaintiffs' indemnification claim (Count IV of the First Amended Complaint). Defendants offer two arguments as to why Plaintiffs "cannot seek indemnification for costs, including attorneys' fees, associated with this action." (Defs.' Mot. for Partial J. on the Pl'gs at 14 [ECF No. 88].) First, Defendants contend that this action relates to or arises out of Plaintiffs efforts to sell their interests in Rockport 2. (*Id.*) And second, Defendants insist that Plaintiffs cannot recover their costs associated with this action because the

Participation Agreement is not "unmistakably clear" that it applies to "legal fees in inter-party suits such as this one." (*Id.*)

### 1.    *The Sale Exception*

Plaintiffs' indemnification claim fails if it relates to or arises out of an offer or sale of their interests in Rockport 2. (*See* Participation Agreement § 7.01(7) (the "sale exception").) Defendants point to language from the Complaint and other filings that allegedly demonstrates that "this action was initiated as a result of [Plaintiffs'] purported efforts to sell their interests in Rockport 2." (*Id.* at 15.) Defendants highlight several of Plaintiffs' statements:

- "Defendants' continuous compliance with their obligations as Lessee was expected to afford the Owner Participants the opportunity to sell their interests as and when their financial strategies and general market conditions made a sale attractive to them." (First Am. Compl. ¶ 23 [ECF No. 121].)

- "In light of [Philip Morris Capital Corporation's ("PMCC")] determination that the modified Operating Restriction substantially diminished the price for which PMCC could sell its ownership interests, PMCC decided in 2013 to postpone its planned sale of its interest, pending an effort to establish Lessees' own responsibility to satisfy (or bear the financial consequences of) the condition on future operation of the Facility established by the Consent Decree and Modification." (Decl. of Alex T. Russo ¶ 30 [ECF No. 50-1].)

- The Consent Decree and Modification have "prevented two of the Plaintiffs from implementing a specific business plan to sell those interests now, because the billion-plus-dollar encumbrance unquestionably depresses the price they can receive (absent redress in this action)." (Pls.' Mem. in Opp'n to First Mot. to Dismiss at 2 [ECF No. 50].)

Plaintiffs respond by clarifying that they "are not trying to recover damages for an inadequate sale price (or offer), as the [s]ale [e]xception contemplates. Instead, the Expenses to be indemnified here 'arise from' and 'relate to' the breach itself, and the associated litigation." (Pls.' Mem. in Opp'n to Mot. for Partial J. on the Pl'gs at 43 [ECF No. 94].) Moreover, the sale exception only covers Expenses related to an "actual 'sale' or 'offer' to sell interests," Plaintiffs argue. (*Id.*) Plaintiffs have the better of this argument.

As an initial matter, Defendants have attempted to expand the scope of the sale exception beyond the language of Section 7.01(7). Defendants repeatedly refer to Plaintiffs' "efforts" to sell their interests in Rockport 2. (Defs.' Mot. for Partial J. on the Pl'gs at 15.) But the sale exception clearly does not include any reference to "efforts." (Participation Agreement § 7.01(7).) The exception refers to "offer[s]" and "sale[s]." (*Id.*)[9]

The sale exception applies to "any Expense . . . that relates to or arises out of . . . the offer or sale . . . of any interest in the Trust Estate or the Trust Agreement or any similar interest." (Participation Agreement § 7.01.) The phrase "relates to or arises out of" has a broad meaning. (Defs.' Mot. for Partial J. on the Pl'gs at 16.)[10] An Expense "arises out of" the offer or sale of any interests if the Expense "originate[s]" from the offer or sale. *See* Merriam-Webster, http://www.merriam-webster.com/dictionary/arise (last visited Mar. 17, 2016) (defining "arise"). An Expense "relates to" the offer or sale of any interests if the Expense has a "relationship or connection" to the offer or sale. *See* Merriam-Webster, http://www.merriam-

---

[9] Black's Law Dictionary defines an "offer" as "[t]he act or instance of presenting something for acceptance" and a "sale" as "[t]he transfer of property or title for a price." Black's Law Dictionary 535, 665 (4th Pocket Ed. 2011).

[10] The two terms that constitute this phrase do not offer equal coverage; "relates to" has a broader meaning than "arises out of." *See Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128–30 (2d Cir. 2001) ("The term 'related to' is typically defined more broadly [than 'arises out of'] and is not necessarily tied to the concept of a causal connection.").

webster.com/dictionary/relate (last visited Mar. 17, 2016) (defining "relate").[11]

Although these terms are broad, they do not extend indefinitely. An Expense cannot relate to (have a relationship or connection to) or arise out of (originate from) "the offer or sale . . . of any interest" when no offer or sale exists. (*See* Participation Agreement § 7.01.)[12] The Court agrees with Plaintiffs that the sale exception only bars indemnification for Expenses that relate to or arise out of an offer or sale that has actually materialized. And here, Plaintiffs have represented that no "actual 'sales' or 'offers' to sell" their interests in Rockport 2 exist. (Pls.' Mem. in Opp'n to Mot. for Partial J. on the Pl'gs at 43.) Accordingly, the sale exception does not bar Plaintiffs' indemnification of costs associated with this action.[13]

### 2. *Indemnification for Inter-Party Suits*

Defendants next argue that the indemnification clause runs afoul of New York law. Section 7.01 states in relevant part:

> **General Indemnity.** The Lessee agrees, whether or not any of the transactions contemplated hereby are consummated, to indemnify on an After-Tax Basis each Indemnitee against, and to protect, save and keep harmless each Indemnitee from, any and all Expenses that may be imposed on, incurred by or asserted against such Indemnitee in any way relating to or arising out of: (a) the Rockport Plant (including Unit 2 and the Undivided Interest), the Rockport Plant Site (including the Unit 2 Site, the Unit 2 Site Interest and the Easements) or the Common Facilities or any part thereof or interest therein; (b) any of the Transaction Documents or any of the transactions contemplated thereby, other than Transaction Expenses that are the responsibility of the Owner Trustee pursuant to Section 9.01 and Expenses incurred by the Indemnitees in connection with a transfer by the Owner Participant to which Article VIII applies; (c) the construction, preparation, installation, inspection, delivery, non-delivery, acceptance, rejection, purchase, ownership, possession, rental, lease, sublease, maintenance, repair, storage, transfer of title, redelivery, use, operation, condition, sale, return or other application or disposition of all or any part of any interest in

---

[11] The Court looks to the normal usage of "relates to" and "arises out of" given that the parties do not define these terms for purposes of the Participation Agreement.

[12] Section 7.01 is unambiguous with respect to this issue.

[13] If a sale or offer to sell Rockport 2 actually materializes, the sale exception would bar Plaintiffs from obtaining indemnification for Expenses related to or arising out of that offer or sale. (*See* Participation Agreement § 7.01.)

the Rockport Plant (including Unit 2 and the Undivided Interest), the Rockport Plant Site (including the Unit 2 Site, the Unit 2 Site Interest and the Easements) or the Common Facilities, or the imposition of any Lien (or incurrence of any liability to refund or pay over any amount as a result of any Lien) thereon, including, without limitation, (i) claims or penalties arising from any violation of law or in tort (strict or otherwise), (ii) loss of or damage to any property or the environment (including, without limitation, clean-up costs, response costs, costs of corrective action, costs of financial assurance and natural resource damages), or death or injury to any Person (iii) latent or other defects, whether or not discoverable, and (iv) any claim for patent, trademark or copyright infringement; and (d) the operation, use, possession or ownership by any Person of the remaining interest in the Rockport Plant, the Rockport Plant Site or the Common Facilities . . . .

. . . .

If the Lessee shall obtain knowledge of any expense indemnified against under this Section 7.01, the Lessee shall give prompt notice thereof to the appropriate Indemnitee or Indemnitees, and if any Indemnitee shall obtain any such knowledge, such Indemnitee shall give prompt notice thereof to the Lessee. With respect to any amount that the Lessee is requested by an Indemnitee to pay by reason of this Section 7.01, such Indemnitee shall, if so requested by the Lessee and prior to any payment submit such additional information to the Lessee as the Lessee may reasonably request properly to substantiate the requested payment.

In case any action, suit or proceeding shall be brought against any Indemnitee, such Indemnitee shall notify the Lessee of the commencement thereof (but the failure to do so shall not relieve the Lessee of its obligation to indemnify such Indemnitee except to the extent that the Lessee is prejudiced as a result of such failure), and the Lessee shall be entitled, at its expense, acting through counsel acceptable to such Indemnitee, to participate in, and to the extent that the Lessee desires, to assume and control the defense thereof; *provided*, *however*, that the Lessee shall not be entitled to assume and control the defense of any such action, suit or proceeding if and to the extent that, in the opinion of such Indemnitee, such action, suit or proceeding involves the potential imposition of criminal liability on such Indemnitee or a conflict of interest between such Indemnitee and the Lessee or entails a reasonable possibility of compromising or jeopardizing any substantial interest of such Indemnitee. Such Indemnitee shall be entitled, at its expense, acting through counsel acceptable to the Lessee, to participate in any action, suit or proceeding the defense of which has been assumed by the Lessee.

Each Indemnitee shall supply the Lessee with such information and documents requested by the Lessee as are necessary or advisable for the Lessee to participate in any action, suit or proceeding to the extent permitted by this Section

20

> 7.01. No Indemnitee shall enter into any settlement or other compromise with respect to any Expense without the prior written consent of the Lessee, which consent shall not be unreasonably withheld or delayed, unless such Indemnitee waives its right to be indemnified under this Section 7.01 with respect to such Expense.

(Participation Agreement § 7.01 [ECF No. 121-1].) According to Defendants, Plaintiffs cannot obtain indemnification for costs associated with this action (including attorneys' fees) because "the indemnification provision in § 7.01 of the Participation Agreement does not make it 'unmistakably clear' that legal fees in inter-party suits such as this one are subject to indemnification." (Defs.' Mot. for Partial J. on the Pl'gs at 14 [ECF No. 88].) Defendants note that § 7.01 "does not expressly extend to attorneys' fees in inter-party suits." (*Id.* at 17.) Defendants also point out that "multiple clauses of Section 7.01 can only be reasonably applied to third-party suits." (*Id.* at 18.)

Plaintiffs disagree. They explain that Defendants' indemnification obligations under § 7.01 reach "'*any and all* Expenses . . . relating to or arising out of . . . the Rockport Plant (including Unit 2 and the Undivided Interest) . . . [or] any of the Transaction Documents.'" (Pls.' Mem. in Opp'n to Mot. for Partial J. on the Pl'gs at 39 [ECF No. 94] (quoting Participation Agreement § 7.01).) The term "Expenses," they continue, includes "'expenses and disbursements (including legal fees and expenses) of any kind and nature whatsoever.'" (*Id.* (quoting Participation Agreement, App. A at 6).) This broad language is, Plaintiffs insist, "sufficiently clear to reach attorneys' fees arising out of inter-party disputes." (*Id.* at 38.)

In *Hooper Associates, Ltd. v. AGS Computers, Inc.*, the New York Court of Appeals outlined the state's law on indemnification of attorney's fees. 548 N.E.2d 903, 904–06 (N.Y. 1989). Under the general rule, the *Hooper* court explained, "attorney's fees are incidents of litigation and a prevailing party may not collect them from the loser unless an award is

21

authorized by agreement between the parties, statute or court rule." *Id.* at 904. In light of this general rule, a court applying New York law should not interpret an indemnification agreement to cover attorney's fees in inter-party disputes "unless the intention to do so is unmistakably clear from the language of the promise." *Id.* at 905.

The indemnification agreement at issue in *Hooper* failed this test. The agreement did "not contain language clearly permitting plaintiff to recover from defendant the attorney's fees incurred in a suit against defendant." *Id.* Rather, the agreement obligated the defendant to

> "indemnify and hold harmless [plaintiff] . . . from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees" arising out of breach of warranty claims, the performance of any service to be performed, the installation, operation and maintenance of the computer system, infringement of patents, copyrights, or trademarks and the like.

*Id.* These potential subjects for reimbursement were all "susceptible to third-party claims," and "[n]one [were] exclusively or unequivocally referable to claims between the parties themselves," the court noted. *Id.* The *Hooper* court's holding was bolstered by the fact that other provisions in the contract "unmistakably relate[d] to third-party claims." *Id.* Notably, one provision required the plaintiff to "'promptly notify' defendant of 'any claim or litigation to which the indemnity [provision] shall apply.'" *Id.* That provision "further provide[d] that defendant 'may assume the defense of any such claim or litigation with counsel satisfactory to [plaintiff].'" *Id.* Extending the indemnification agreement to inter-party disputes "would render these provisions meaningless," the *Hooper* court stated, "because the requirement of notice and assumption of the defense has no logical application to a suit between the parties." *Id.* Interpreting the indemnification agreement to cover only attorney's fees stemming from third-party suits would afford "a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect," the court explained. *Id.*

Here, § 7.01 of the Participation Agreement does not make it unmistakably clear that attorney's fees in inter-party suits are subject to indemnification.[14] Section 7.01 does not expressly indicate that it encompasses attorney's fees in inter-party suits. Section 7.01 does not even reference inter-party suits. Granted, § 7.01 encompasses "any and all Expenses." (Participation Agreement § 7.01.) But so did the agreement in *Hooper*. And when the New York Court of Appeals considered that "any and all" language, the court found that the language was insufficiently clear to trump the general rule on attorney's fees mandating that each party pay its own way. *See Hooper*, 548 N.E.2d at 904–06; *see also In re Refco Sec. Lit.*, 890 F. Supp. 2d 332, 343 (S.D.N.Y. 2012) ("A provision containing only broad language that does not unequivocally indicate that the parties intended to indemnify attorneys' fees in lawsuits between themselves will ordinarily not support a claim for indemnity in suits between the parties."). Plaintiffs cite several cases in which courts considering broadly worded indemnification agreements have found those agreements to be unmistakably clear. Those cases are inapposite. *Crossroads ABL LLC v. Canaras Capital Management, LLC*, involved a contract in which no other provisions "would be rendered meaningless if the indemnification provision [were] read to include any claims—intra-party or otherwise." 963 N.Y.S.2d 645, 646 (App. Div. 2013). Here, as explained below, several provisions of § 7.01 would have no logical meaning in the context of an inter-party dispute. In *E*Trade Financial Corp. v. Deutsche Bank AG*, the contract at issue referenced disputes between the parties in its description of the indemnity provision's coverage. 374 F. App'x 119, 123–24 (2d Cir. 2010). Moreover, the contract in *E*Trade* included "a separate indemnity provision for third-party claims," which would have made little sense if the contract's other indemnity provision only encompassed disputes with third-parties. *See id.* at 124. In the present case, § 7.01 does *not* reference "disputes between the parties," just as the Participation

---

[14] Section 7.01 is ambiguous with respect to this issue.

23

Agreement does *not* include a separate indemnity provision for third-party claims. (*See generally* Participation Agreement.) The contract at issue in *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.* is also inapposite. 418 F.3d 168, 177–79 (2d Cir. 2005). Like the contract in *E*Trade*, the contract at issue in *Mid-Hudson* included two indemnification provisions; one of the provisions was written more broadly than the other. *See id.* at 178–79. To give meaning to the distinct language found in each provision, the *Mid-Hudson* court interpreted the broader provision to encompass inter-party disputes. *See id.* Here, as noted above, the Participation Agreement does not include two indemnity provisions. (*See generally* Participation Agreement.)

Like the agreement in *Hooper*, § 7.01 includes several provisions that would have "no logical application to a suit between the parties." *See Hooper*, 548 N.E.2d at 905. First, § 7.01 entitles the Lessee (here, the Defendants) to participate in the Indemnitee's (Plaintiffs') defense. (*See* Participation Agreement § 7.01.) Permitting the Lessee to participate in the Indemnitee's defense has no logical application to an inter-party suit in which the Lessee sues the Indemnitee. Applied to that situation, the provision would allow a Lessee to participate in the defense of the Indemnitee that it is suing.[15] Plaintiffs attempt to make sense of this provision by highlighting the qualification that "the Lessee shall not be entitled to assume and control the defense" of an action

---

[15] This provision of § 7.01 does not appear to cover the present situation, where the Indemnitees (Plaintiffs) have sued the Lessees (Defendants). The provision applies "[i]n case any action, suit or proceeding shall be *brought against* any Indemnitee." (Participation Agreement § 7.01 (emphasis added).) Here, no suit has been brought against the Indemnitees (Plaintiffs); rather, the Indemnitees initiated the suit. The situation here could be covered by another provision of § 7.01, which provides that "[i]f any Indemnitee shall obtain any such knowledge [of an indemnified Expense], such Indemnitee shall give prompt notice thereof to the Lessee." (*See id.*) The coverage is tenuous though. In a suit brought by the Indemnitee against the Lessee, the Indemnitee would have to provide the Lessee, under the rules of civil procedure, with a copy of the complaint, which would plead the hypothetical indemnification claim. The prompt notice provision in § 7.01 would thus become superfluous, as the Lessee would already have notice of the potential indemnified expense thanks to the complaint. Yet, regardless of whether the prompt notice provision applies here, the fact that § 7.01 does not expressly account for one of two varieties of inter-party disputes (where the Indemnitee sues the Lessee as compared to where the Lessee sues the Indemnitee) further undermines the notion that the parties envisioned § 7.01 to mandate indemnification for inter-party disputes.

if the action involves "a conflict of interest" between the Indemnitee and the Lessee. (Pls.' Mem. in Opp'n to Mot. for Partial J. on the Pl'gs at 40–41 [ECF No. 94].) But that qualification only prohibits the Lessee (Defendants) from "assum[ing] and control[ing]" the defense. (*See* Participation Agreement § 7.01.) The Lessee, even in situations involving a conflict of interest, is still free under § 7.01 to participate in the defense—which produces an absurd result if the Lessee is suing the Indemnitee. Second, § 7.01 mandates that the Indemnitee provide the Lessee "with such information and documents requested by the Lessee as are necessary or advisable for the Lessee to participate" in the Indemnitee's defense. (*Id.*) Again, this produces an illogical result in an inter-party suit in which the Lessee is suing the Indemnitee. And although Plaintiffs note that this information exchange is limited "to the extent permitted by this Section 7.01," Plaintiffs overlook the fact that § 7.01 permits Lessees to participate in the Indemnitee's defense even in situations involving a conflict of interest. (*See id.*) Lastly, § 7.01 prohibits the Indemnitee from "enter[ing] into any settlement or other compromise with respect to any Expense without the prior written consent of the Lessee." (*Id.*) Applied to an inter-party dispute, the Lessee would be placed in the nonsensical position of consenting to the Indemnitee entering into the Lessee's own settlement agreement.

Other courts that have analyzed indemnification agreements similar to § 7.01 have also held that those agreements fail *Hooper*'s "unmistakably clear" test and do not apply to attorney's fees in inter-party disputes. *See, e.g.*, *PPI Enterprises (U.S.), Inc. v. Del Monte Foods Co.*, Nos. 05-6885-cv, 05-7040-cv, 2006 WL 3370698, at *1 (2d Cir. Nov. 20, 2006) (finding that an indemnification agreement was not unmistakably clear in part because subsections of the agreement endowed Del Monte with "the right to approve its indemnitees' choice of counsel," required "Del Monte to cooperate in the defense of actions brought against indemnitees," and

required indemnitees "to procure Del Monte's consent before settling any covered claim");

*Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 198–200 (2d Cir. 2003) (holding that a

broadly worded indemnification provision was not unmistakably clear that it covered attorney's

fees in inter-party disputes because the provision could be interpreted to refer only to third-party

claims); *Wells Fargo Bank Nat'l Ass'n v. Webster Bus. Credit Corp.*, 979 N.Y.S.2d 298, 301

(App. Div. 2014) (holding that the parties' indemnification provisions, even though they were

broadly worded, did not "evince an 'unmistakably clear' intention" to encompass attorney's fees

in inter-party disputes because the provisions "expressly contemplate[d] third-party claims"

without clearly implying "that the parties intended the provision to provide for indemnification

in litigation against each other").

Plaintiffs make one final argument: that "many of the disputes expressly covered by

Section 7.01 could realistically arise only between the parties." (Pls.' Mem. in Opp'n to Mot. for

Partial J. on the Pl'gs at 40–41.) These alleged party-only disputes include "'delivery, non-

delivery, . . . maintenance . . ., or transfer of title' of Rockport 2," as well as "'possession' of

Rockport 2." (*Id.* at 41 (quoting (Participation Agreement § 7.01).) The Court disagrees. As

Defendants correctly observe, "[i]t is entirely possible that Plaintiffs could convey title in

Rockport 2 to some third-party or that Defendants could transfer possession of the facility to

some third-party, and that a dispute could arise from either of those sorts of transactions." (Defs.'

Reply in Supp. of Mot. for J. on the Pl'gs at 13 [ECF No. 112].) And the possibility that § 7.01

could encompass attorney's fees in inter-party disputes does not amount to unmistakable clarity,

as required by *Hooper*, that the agreement does encompass those attorney's fees. *See Hooper*,

548 N.E.2d at 905–06; *see also In re Refco*, 890 F. Supp. 2d at 343 ("[I]f [an] indemnity

provision . . . is subject to a reasonable interpretation one way or another, the agreement must be construed not to indemnify . . . legal expenses [for inter-party disputes].").

In sum, it is not unmistakably clear that § 7.01 of the Participation Agreement mandates indemnification for attorney's fees associated with inter-party disputes. As such, the Court dismisses Plaintiffs' indemnification claim to the extent that it seeks indemnification for the attorney's fees associated with this action.

**D.      Section 6.01(j) Claim**

Plaintiffs allege that Defendants breached § 6.01(j) of the Participation Agreement and § 20 of the Facility Lease.[16] Plaintiffs have moved for summary judgment on that claim, and Defendants have moved for the claim's dismissal. Section 6.01(j) provides that

> [t]he Lessee shall not take any action (or omit to take any action), whether by voting (or failing to vote) in meetings of the Rockport Plant Companies or otherwise, the taking or omission of which will materially adversely affect the operation, safety, capacity, economic useful life or any other aspect of Unit 2 (including the Undivided Interest).

(Participation Agreement § 6.01(j) [ECF No. 121-1].)

By agreeing to install a scrubber by the end of 2019 in the Consent Decree and then changing the scrubber installation date to 2028 in the 2013 Modification, Defendants allegedly violated § 6.01(j). (*See* Pls.' Mem. in Supp. of Mot. for Partial Summ. J. at 12 [ECF No. 124].) This date change purportedly "shift[s] to Plaintiffs a legal obligation to install [the] scrubber" and thus imposes a burden that materially adversely affects Plaintiffs' interests in Rockport 2. (*See id.*)

---

[16] As mentioned above, § 20 of the Facility Lease incorporates into that document § 6.01(j) of the Participation Agreement. (*See* Facility Lease § 20 [ECF No. 121-2] ("The Lessee agrees to comply with its covenants and agreements set forth in Section 6.01 of the Participation Agreement . . . [which are] incorporated herein by this reference as fully as if set forth in full at this place.").)

Defendants offer an alternative interpretation, which involves several steps. First, they argue that Sections 5 and 7 of the Facility Lease expressly permit them to enter into consent decrees like the ones at issue here. (*See* Defs.' Mot. for Partial J. on the Pl'gs at 6–7 [ECF No. 88].) Section 7 states that

> [t]he Lessee shall not directly or indirectly create, incur or suffer to exist any Lien on or with respect to the Undivided Interest or the Unit 2 Interest, the Lessor's title thereto or interest therein, as the case may be, or any title or interest of the Lessee therein, except Permitted Liens, and the Lessee, at its own expense, shall take such action as may be necessary duly to discharge any such Lien that may arise.

(Facility Lease § 7 [ECF No. 121-2].) And § 5 provides, in relevant part, that at the time Defendants relinquish possession of Rockport 2 to Plaintiffs, Rockport 2

> shall be free and clear of all Liens (other than Liens described in clauses (i), (iii), (iv) (to the extent such Taxes are not due and payable), (vi), (vii) (to the extent such Liens are bonded), (viii) through (xiv) and (xvii) of the definition of 'Permitted Liens').

(*Id.* § 5.) Sections 5 and 7 purportedly establish in Defendants a "right" to enter into Permitted Liens. (Defs.' Second Mot. to Dismiss at 13–14 [ECF No. 131].)

Defendants next analyze the seventeen types of "Permitted Liens" that the parties defined. (*Id.* at 15 (citing Facility Lease, App. A at 13–14).) The parties expressly indicated that some Permitted Liens *cannot* have a material adverse effect on Rockport 2 (i.e., Permitted Liens subsections (xiv) and (xvii)). (*See id.*) However, with respect to the remaining types of Permitted Liens, the parties do not make any reference to material adverse effects. (*See id.* at 16.) This second category of Permitted Liens (which encompasses consent decrees) *can* have a material adverse on Rockport 2, Defendants argue. (*See id.*) As the Court held in its prior Opinion and Order, consent decrees are "Permitted Liens." (Jan. 13, 2015 Op. & Order at 21 [ECF No. 73].)

28

The Consent Decree and 2013 Modification fall within subsection (x) of the definition of Permitted Liens, which reads as follows:

> rights reserved to or vested in any Governmental Authority to condemn or appropriate the Undivided Interest, Unit 2, any Modification, the Unit 2 Site, the Unit 2 Site Interest, the Common Facilities, the Easements, the Rockport Plant Site or the Rockport Plant, or to control or regulate any of the foregoing or the use thereof in any manner.

(Facility Lease, App. A at 13.) Thus, according to Defendants, "Section 5 and 7 of the Facility Lease . . . unambiguously provide that a Permitted Lien imposed by a consent decree (which by definition can have a material adverse effect) need not be discharged by Defendants and can be left encumbering Rockport 2 if, and when, it is surrendered to Plaintiffs." (Defs.' Second Mot. to Dismiss at 16.)

Defendants continue: given that § 6.01(j) of the Participation Agreement would seemingly prohibit the existence of the 2013 Modification beyond the end of the Lease Term (because the Modification might have a materially adverse effect on Rockport 2), § 6.01(j) directly conflicts with Sections 5 and 7, which expressly permit Defendants to enter into the 2013 Modification. (Defs.' Mem. in Opp'n to Mot. for Partial Summ. J. at 28 [ECF No. 174].) The conflict here, Defendants urge, is between specific contract provisions (Sections 5 and 7) and a general contract provision (§ 6.01(j)). (Defs.' Second Mot. to Dismiss at 18.) And under New York law, when specific and general provisions conflict, specific language purportedly controls over general language. (*Id.*)[17]

---

[17] Defendants offer two additional arguments as to why the § 6.01(j) claim fails. The Court need not address these additional arguments though given that the Court disposes of the § 6.01(j) claim under Defendants' primary argument, outlined above.

1.  **_The Existence of a Conflict Between § 6.01(j) and Sections 5 and 7_**

The Court agrees with Defendants that § 6.01(j) conflicts with Sections 5 and 7.[18]

Assuming, as Plaintiffs do, that the 2013 Modification "will materially adversely affect"

Rockport 2, § 6.01(j) would prohibit Defendants from entering into the Modification. (*See*

Participation Agreement § 6.01(j).) By contrast, Sections 5 and 7 of the Facility Lease, when

read in conjunction with the definition of "Permitted Liens," indicate that consent decrees, such

as the 2013 Modification, can encumber Rockport 2 regardless of whether the consent decree is

still in effect when the Lease Term ends and regardless of whether the consent decree materially

adversely affects Rockport 2. (*See* Facility Lease §§ 5, 7, and App. A, at 13–14.)

Plaintiffs contest Defendants' interpretation of Sections 5 and 7. Plaintiffs deny that those

sections endow Defendants with a "right" to create Permitted Liens. (*See* Pls.' Mem. in Supp. of

Mot. for Partial Summ. J. at 26–27 [ECF No. 124].) Plaintiffs imply that without a "right" to

create Permitted Liens, Defendants' breached § 6.01(j) when they entered into the 2013

Modification. (*See id.*) Intertwined with this argument is Plaintiffs' assertion that the parties

reference "Permitted Liens" only to establish exceptions to "specific prohibitory covenant[s]"

such as § 7's general prohibition against Defendants incurring Liens or § 5's general mandate

that Defendants return Rockport 2 to Plaintiffs free and clear of Liens. (*See id.*) Thus, according

to Plaintiffs, whether an action or an encumbrance constitutes a Permitted Lien purportedly has

no bearing on whether that action or encumbrance is permissible with respect to contract

provisions that do not specifically reference Permitted Liens. (*See id.* at 27–29.) Under Plaintiffs'

interpretation, Defendants did not violate Sections 5 and 7 when they entered into the 2013

Modification because those provisions specifically remove certain Permitted Liens from their

---

[18] Sections 5 and 7 of the Facility Lease and § 6.01(j) of the Participation Agreement are unambiguous with respect to this issue.

coverage. (*See id.* at 29.) But Defendants violated § 6.01(j) because that provision does not contain a specific exception for Permitted Liens. (*See id.*) Plaintiffs' argument is not well taken.

As an initial matter, the language used in Sections 5 and 7 of the Facility Lease implies that Defendants have the authority to create Permitted Liens. (*See* Facility Lease § 7 ("The Lessee shall not directly or indirectly *create* . . . any Lien . . . *except* Permitted Liens." (emphasis added)); Facility Lease § 5 ("At the time of such surrender . . . the Unit 2 Site Interest and the Easements shall be free and clear of all Liens (*other than* [certain types of Permitted Liens]) . . . ." (emphasis added)).) The broad wording of Sections 5 and 7 does not lend itself to the narrow interpretation that Plaintiffs offer (i.e., that Permitted Liens are only permitted within the context of those sections). (*See id.* §§ 5 and 7.) And more specifically, given that consent decrees (which are Permitted Liens) must, by definition, be created at least in part by Defendants, it follows that Defendants have the authority to create consent decrees. (Jan. 13, 2015 Op. & Order at 21; *see* Facility Lease, App. A at 13.)[19]

Ultimately though, Defendants' purported right to create Permitted Liens is irrelevant. Whether Defendants breached § 6.01(j) does not hinge on whether Defendants had an affirmative right to create Permitted Liens. Irrespective of that question, Sections 5 and 7 clearly authorize the *existence* of certain Permitted Liens that extend beyond the conclusion of the Lease Term. (*See* Facility Lease §§ 5 and 7.) Likewise, the parties clearly did not reference Permitted Liens in their agreements only as exceptions to specific prohibitory covenants. (*See id.*) Sections 5 and 7 do not state, or imply, that Permitted Liens can only exist in the context of those specific sections. (*See id.*) Indeed, it would make little sense for the parties to generally authorize the existence of Permitted Liens, but limit that existence to two specific provisions of the Facility

---

[19] A consent decree is "[a] court decree that all parties agree to." Black's Law Dictionary 207 (4th Pocket Ed. 2011).

Lease.[20]

      Plaintiffs invoke a canon of contractual interpretation, "*expressio unius est exclusio alterius*" (i.e., the expression of one thing implies the exclusion of the other), to bolster their interpretation of Sections 5 and 7. (*See* Pls.' Mem. in Supp. of Mot. for Partial Summ. J. at 30.) Specifically, Plaintiffs argue that Defendants' creation of the 2013 Modification breaches § 6.01(j) despite the fact that the Modification is a Permitted Lien because § 6.01(j), unlike other contract provisions, "contains no exception for Permitted Liens." (*See id.* at 31–32.) Plaintiffs' argument hinges on the assumption that the parties only referenced "Permitted Liens" in their agreements when they wanted to excuse Defendants' noncompliance with a specific covenant. (*See id.* at 30.) But, as discussed above, that assumption is incorrect. The language that the parties used in Sections 5 and 7 of the Facility Lease authorizes the existence of Permitted Liens—like the 2013 Modification—that can encumber Rockport 2 beyond the conclusion of the Lease Term and, as indicated in the definition of "Permitted Liens," can do so irrespective of material adverse effects. (*See* Facility Lease §§ 5, 7, and App. A, at 13–14.)[21]

---

[20] Plaintiffs cite § 8(h) of the Facility Lease and § 7.01 of the Participation Agreement to establish that Permitted Liens are only used as exceptions to specific prohibitory covenants. Plaintiffs note that "while Section 8(h)(1) specifically exempts certain Permitted Liens from Section 8(a) liability, Section 8(h)(3) contains no such exemption." (*See* Pls.' Mem. in Supp. of Mot. for Partial Summ. J. at 28.) And in § 7.01, Lessees (Defendants) indemnify Lessors (Plaintiffs) against "'any and all Expenses . . . in any way relating to or arising [during the Lease Term] out of . . . the imposition of any Lien . . . including, without limitation . . ., costs of corrective action'—all without regard to whether the Lien from which the indemnified Expenses arise is or is not a Permitted Lien." (*Id.* at 28–29 (quoting Participation Agreement § 7.01(a)).) Section 7.01 purportedly demonstrates that "not only are 'Permitted Liens' not *generally* allowed, but that even in some circumstances in which 'Permitted Liens' are exempt from *specific* Lien-based covenants, they are not fully exempt even from those specific covenants themselves." (*Id.* at 29 n.17.) The fact, however, that a specific contract provision prohibits Permitted Liens in limited circumstances (explained in more detail *infra*) or that Permitted Liens are expressly encompassed within Defendants' indemnity obligations does not alter the language used in Sections 5 and 7 of the Facility Lease, which explicitly authorizes the existence of certain Permitted Liens (such as the 2013 Modification) that extend beyond the conclusion of the Lease Term. (*See* Facility Lease §§ 5, 7, and 8; Participation Agreement § 7.01(a).)

[21] Indeed, if the canon, *expressio unius est exclusio alterius*, has an application in the parties' agreements, it is likely within the definition of "Permitted Liens," where the parties defined seventeen types of

Even if Section 5 and 7 authorize the existence of Permitted Liens, those sections still do not necessarily conflict with § 6.01(j), Plaintiffs argue. (*See* Pls.' Mem. in Supp. of Mot. for Partial Summ. J. at 35–36.) Attempting to "harmonize" Sections 5 and 7 with § 6.01(j), Plaintiffs note that § 6.01(j) does not "condemn *any* Permitted Lien that materially adversely affects [Plaintiffs'] interests"; § 6.01(j) only condemns a Permitted Lien if "it was *caused by Defendants' own acts or omissions*." (*Id.* at 35–36.) By parsing § 6.01(j)'s application along those lines, Plaintiffs insist that § 6.01(j) "should rarely reach arrangements that constitute Permitted Liens under Section 7. The very category of Permitted Liens under consideration here—those arising from 'rights reserved to or vested in any Governmental Authority . . . to control or regulate' Rockport 2—are unlikely to have been caused by Defendants' own acts or omissions during the Lease Term in most cases (even though this one was)." (*Id.*)

Plaintiffs' purported harmonization does not actually alleviate the conflict in this case between § 6.01(j) and Sections 5 and 7. Under Plaintiffs' proposal, a subset of Permitted Liens are still permitted under Sections 5 and 7 but prohibited under § 6.01(j). (*See* Pls.' Mem. in Supp. of Mot. for Partial Summ. J. at 36.) This subset would seemingly include *all* consent decrees because, by definition, parties to a consent decree must consent to be bound to the agreement. (*See id.* (opining that Defendants' consent to the 2013 Modification constituted an "act[]" sufficient to implicate § 6.01(j) under the harmonized interpretation of that section).)[22] Thus,

---

Permitted Liens and indicated that two of those types of Permitted Liens *cannot* have a materially adverse effect on Rockport 2. (*See* Facility Lease, App. A at 13–14.) The parties did not include any reference to material adverse effects with respect to the remaining types of Permitted Liens, implying that the remaining types of Permitted Liens *can* have a materially adverse effect on Rockport 2. (*See id.*)

[22] The parties did not distinguish between varying types of consent decrees in subsection (x) of the definition of "Permitted Liens." (*See* Facility Lease, App. A, at 13.) Consent decrees are Permitted Liens regardless of whether Defendants created (through their own acts or omissions), or cooperated with the Government in creating, the consent decree. (*See id.*; *see also* Jan. 13, 2015 Op. & Order at 21.)

under Plaintiffs' harmonization, Sections 5 and 7 would still authorize the existence of the 2013

Modification while § 6.01(j) would still prohibit it.[23]

Finally, Plaintiffs argue that the Court should not interpret Sections 5 and 7 to authorize

the existence of Permitted Liens because doing so would allow Defendants "to impose a crushing

burden on Plaintiffs' interests at Defendants' sole discretion." (Pls.' Mem. in Supp. of Mot. for

Partial Summ. J. at 37.) But Plaintiffs complain of a hypothetical burden. (Pls.' Mem. in Supp. of

Mot. for Partial Summ. J. at 37 (speculating that Defendants' interpretation of § 6.01(j) would

permit Defendants to agree in a consent decree "to the Facility's permanent closure one month

after the end of the Lease Term").) No such burden was imposed here.

In sum, Sections 5 and 7, read in conjunction with the definition of "Permitted Liens,"

allow for the existence of the 2013 Modification. Section 6.01(j) does not. A conflict exists

between the sections.

### 2.    *Resolving the Conflict Between § 6.01(j) and Sections 5 and 7*

Under New York law, when provisions within a contract conflict, specific provisions

control over more general provisions. *See Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690

(N.Y. 1956) ("[I]f there [is] an inconsistency between a specific provision and a general

provision of a contract . . ., the specific provision controls."); *Hejna v. Reilly*, 931 N.Y.S.2d 192,

193 (App. Div. 2011) ("'[W]here a contract . . . employs contradictory language, specific

provisions control over general provisions.'" (quoting *Green Harbour Homeowners' Ass'n, Inc.*

*v. G.H. Dev. & Constr., Inc.*, 789 N.Y.S.2d 319, 321 (App. Div. 2005))); *Andersen v. Andersen,*

---

[23] The mandate under New York law to read "[a]ll parts of a contract . . . in harmony," *Bombay Realty Corp. v. Magna Carta, Inc.*, 790 N.E.2d 1163, 1165 (N.Y. 2003), and to give "'[e]ffect and meaning . . . to every term of the contract,'" *Vill. of Hamburg v. Am. Ref-Fuel Co. of Niagara, L.P.*, 727 N.Y.S.2d 843, 846 (App. Div. 2001) (quoting *Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d 555, 557 (App. Div. 1996)), does not save Plaintiffs' harmonization proposal. As the Court explains below, § 6.01(j) retains effect and meaning even if it does not prohibit the existence of the 2013 Modification.

892 N.Y.S.2d 553, 554–55 (App. Div. 2010) (same); *DeWitt v. DeWitt*, 879 N.Y.S.2d 516, 517

(App. Div. 2009) (same); *Huen N.Y., Inc. v. Bd. of Educ. Clinton Cent. Sch. Dist.*, 890 N.Y.S.2d

748, 749 (App. Div. 2009) (same); *Bank of Tokyo-Mitsubishi, Ltd., N.Y. Branch v. Kvaerner a.s.*,

671 N.Y.S.2d 905, 910 (App. Div. 1998) (same); *Aguirre v. City of New York*, 625 N.Y.S.2d

597, 598 (App. Div. 1995) (same).

Here, Sections 5 and 7 are more specific than § 6.01(j). In § 7, the parties indicate that

Permitted Liens can exist (unlike other Liens). (*See* Facility Lease § 7 [ECF No. 121-2].) And in

§ 5, the parties identify the specific types of Permitted Liens that can continue encumbering

Rockport 2 beyond the conclusion of the Lease Term. (*See id.* § 5.) Section 6.01(j), by contrast,

generally notes that Lessee shall "not take any action (or omit to take any action) . . . which will

materially adversely affect" Rockport 2. (Participation Agreement § 6.01(j) [ECF No. 121-1].)

Section 6.01(j), unlike Sections 5 and 7, does not directly address the issue most relevant to this

dispute—whether Defendants can shift to Plaintiffs the obligation to install a scrubber at

Rockport 2 by leaving the 2013 Modification (a Permitted Lien) as an encumbrance on Rockport

2 beyond the conclusion of the Lease Term.

Plaintiffs deny that Sections 5 and 7 are the specific provisions most relevant to this

dispute. (*See* Pls.' Mem. in Supp. of Mot. for Partial Summ. J. at 33.) Plaintiffs argue that § 8 of

the Facility Lease "represents the parties' clearest, most specific, and most detailed expression of

intent regarding requirements of Applicable Law to install a scrubber" and "is therefore the

specific clause entitled to preference if the specific-vs.-general canon has any application." (*Id.* at

34.) According to Plaintiffs, "Section 8 reinforces Section 6.01(j)'s emphasis on protection of

[Plaintiffs'] reversionary interests." (*Id.*) Plaintiffs' analysis is misdirected. The Court's task here

is not to identify the contractual provision that, in the abstract, "deal[s] most directly with the

instant case." (*See id.* at 33.) Rather, the Court applies the general vs. specific canon only when contract provisions actually conflict. *See Muzak Corp.*, 133 N.E.2d at 690. As Plaintiffs admit, § 8 does not conflict with § 6.01(j). (*See* Pls.' Mem. in Supp. of Mot. for Partial Summ. J. at 34.) Sections 5 and 7, by contrast, do conflict with § 6.01(j).

Plaintiffs also argue that interpreting Sections 5 and 7 to control over § 6.01(j) will strip that section of effect. (*See* Pls.' Mem. in Supp. of Mot. for Partial Summ. J. at 35.) Plaintiffs' fear is unfounded. Interpreting § 6.01(j) such that it does not prohibit the existence of Permitted Liens expressly allowed under Sections 5 and 7 does not leave § 6.01(j) without effect. Section 6.01(j) still prohibits most other instances in which the Lessee takes an action, or omits to take an action, that materially adversely affects Rockport 2. (*See* Participation Agreement § 6.01(j).) Importantly, Section 6.01(j) prohibits actions or omissions that have a materially adverse effect on Rockport 2 and are not explicitly prohibited (or explicitly permitted) by another contract provision. (*See id.*)

Because Sections 5 and 7 are more specific than § 6.01(j) with respect to the current dispute, Sections 5 and 7 control. The 2013 Modification is permitted under Sections 5 and 7 and, thus, does not breach § 6.01(j).[24]

## E.     Section 8 Claim

Plaintiffs accuse Defendants of breaching § 8 of the Facility Lease. Plaintiffs have moved for summary judgment. Defendants, in turn, have moved to dismiss the § 8 claim. As relevant

---

[24] Under this interpretation, § 6.01(j) still fulfills an important role in the parties' agreements. If the Court were to adopt the converse position—that § 6.01(j) controls over Sections 5 and 7—many of the Permitted Liens that Sections 5 and 7 expressly permit would be prohibited by § 6.01(j). Indeed, such an interpretation would prohibit the existence of an entire subsection of Permitted Liens—consent decrees that have a materially adverse effect on Rockport 2. And although Plaintiffs suggest that the "Defendants' own acts or omissions" requirement would limit § 6.01(j)'s impact on Sections 5 and 7, that limitation does not appear to be as narrow as Plaintiffs suggest. Section 6.01(j) would prohibit Permitted Liens that are the result of "*any* action . . . or omission" by Defendants. (*See* Participation Agreement § 6.01(j) (emphasis added).)

here, § 8 states:

> (a) *Operation and Maintenance.* The Lessee shall cause the Operator to: . . . (iii) use, possess, operate and maintain Unit 2 . . . in compliance with all material applicable Governmental Actions affecting . . . Unit 2 . . . or the use, possession, operation and maintenance thereof . . . . Subject to Section 8(h), the Lessee shall comply, and shall cause the Operator to comply, with all the Lessee's obligations under Applicable Law affecting Unit 2 . . . .

> . . . .

> (c) *Modifications.* The Lessee, at its expense . . . shall participate in the making of any Modification required by the Operating Agreement or, subject to Section 8(h), by any Applicable Law or Governmental Action. In addition, the Lessee, at its expense (except as provided in Section 8(e)), from time to time may participate in the making of any Modification that the Lessee may deem desirable in the conduct of its business; *provided, however*, that the Lessee shall not have the right to participate in the making of any such optional Modification that will materially diminish the value or utility of Unit 2 or materially reduce its remaining useful life.

> . . . .

> (h) *Contest of Requirements of Law.* If, with respect to any requirement of Applicable Law or any Governmental Action relating to the use, operation or maintenance of Unit 2, the Unit 2 Site or the Common Facilities, (i) the Lessee is contesting diligently and in good faith by appropriate proceedings such requirement or Governmental Action, or (ii) compliance with such requirement or Governmental Action shall have been excused or exempted by a valid nonconforming use permit, waiver, extension or forbearance exempting the Lessee from such requirement or Governmental Action . . . then the failure by the Lessee to comply with such requirement or Governmental Action shall not constitute a Default hereunder *provided* that such contest or noncompliance does not involve (A) any danger of (1) foreclosure, forfeiture or loss of the Undivided Interest or (2) criminal liability being imposed . . . or (B) any substantial danger of (1) the sale of , or the creation of any Lien (other than a Permitted Lien) on, the Undivided Interest, (2) material civil liability being imposed . . . or (3) the extension of the ultimate imposition of such Applicable Law beyond the last day of the Lease Term. The Lessee shall provide the Lessor with notice of any context of the type described in clause (i) above in detail sufficient to enable the Lessor to ascertain whether such contest may have any material adverse effect of the type described in the above proviso.

(Facility Lease § 8 [ECF No. 121-2].)

According to Plaintiffs, Defendants agreed in Facility Lease Sections 8(a), (c), and (h) to generally "meet requirements [including the installation of a scrubber] imposed by a consent decree, and any other Applicable Law, at their own expense." (*See* Pls.' Mem. in Supp. of Mot. for Partial Summ. J. at 19–20 [ECF No. 124].) Plaintiffs acknowledge that "[Defendants] may contest any aspect of such a requirement, and/or may seek an extension of the deadline to comply with the requirement, instead of proceeding to comply with it by the stated deadline." (*Id.* at 20.) But if Defendants choose that course of action, Defendants' "actions must 'not involve . . . any substantial danger of . . . the extension of the ultimate imposition of such Applicable Law beyond the last day of the Lease Term.'" (*Id.* (quoting Facility Lease §§ 8(h)(ii) and 8(h)(B)(3)).) Here, Plaintiffs argue, Defendants agreed in the 2007 Consent Decree to the requirement that they would install a scrubber at Rockport 2 by December 31, 2019. (*See id.* at 23.) This deadline "fell almost three years before the end of the Lease Term." (*Id.*) However, through the 2013 Consent Decree Modification, Defendants purportedly "agreed to an extension or forbearance exempting [themselves] from [the scrubber requirement] until six years after the end of the Lease Term [2028]." (*Id.* (internal quotation marks omitted).) In doing so, Defendants allegedly created a substantial danger that the ultimate imposition of the scrubber requirement would extend beyond the last day of the Lease Term. (*See id.*)

Defendants offer a different interpretation. They argue that § 8(h) does not become operative until there is first "a failure to comply with a requirement of Applicable Law." (*See* Defs.' Second Mot. to Dismiss at 26 [ECF No. 131].)

The Court agrees with Defendants. Section 8(h) only applies to Defendants' *failure* to comply with Applicable Law or a Governmental Action. (*See* Facility Lease § 8(h).)[25] Under Plaintiffs' interpretation of § 8(h), Defendants can breach that section even if Defendants have

---

[25] Section 8 of the Facility Lease is unambiguous with respect to this issue.

not failed to comply with Applicable Law or a Governmental Action. Plaintiffs have adopted this interpretation because they appear to assume that Defendants can only obtain extensions to a compliance deadline *prior to the arrival* of the compliance deadline. (*See* Pls.' Mem. in Opp'n to Second Mot. to Dismiss at 12 [ECF No. 172] ("There would be no occasion to apply Section 8(h)(ii), specifying that certain extensions are not a breach—*ever*—if Section 8(a) could only be breached after the legal requirement has become 'current and operative,' because the 'excuse[] or exempt[ion]' by 'permit, waiver, extension or forbearance exempting the Lessee from such requirement' would itself suffice to place Lessees outside of Section 8(a)'s restrictions.").) According to Plaintiffs, "[r]equiring an actual violation of law to show breach [of § 8(h)] would render [Sections 8(h)(ii) and 8(h)(B)(3)] meaningless." (*See id.* (emphasis deleted).)

But Plaintiffs' underlying assumption is incorrect. Defendants could request an extension or be excused or exempted from compliance *after the arrival* of the original compliance deadline. Defendants, for example, could have waited until 2020 before entering into a consent decree modification extending the compliance deadline for the scrubber requirement until 2028. In that situation, Defendants would have failed to comply with Applicable Law if they had not constructed a scrubber by that time (because the compliance deadline for the scrubber installation was December 31, 2019). And in that situation, the consent decree modification would breach § 8(h)(B)(3) if it involved "any substantial danger" of extending the scrubber requirement compliance deadline "beyond the last day of the Lease Term." (*See* Facility Lease § 8(h).) Similarly, if Defendants were "contesting diligently" a requirement of Applicable Law or a Governmental Action, § 8(h) would not take effect until after the passage of the original compliance deadline. If at that point Defendants extended the compliance deadline, Defendants' extension would have to comply with § 8(h)(B)(3)'s mandate.

The Court's interpretation of § 8(h) thus gives effect to Sections 8(h)(ii) and 8(h)(B)(3) without ignoring the requirement that Defendants must first fail to comply with Applicable Law or a Governmental Action before § 8(h) takes effect. The Court's interpretation also accounts for the overall structure and context of § 8(h). *Cf. Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (under New York law, courts must read a contract "as a whole to ensure that undue emphasis is not placed upon particular words and phrases, and to safeguard against adopting an interpretation that would render any individual provision superfluous" (citations and internal quotation marks omitted)). Section 8(h) safeguards Plaintiffs' interests if Defendants choose to challenge or extend a requirement of Applicable Law or Governmental Action. Accordingly, most of the section is spent outlining, and prohibiting, various consequences that could result if Defendants *actually fail* to comply with Applicable Law. The impacts listed in § 8(h)(A), for example—foreclosure, forfeiture, and criminal liability—would not occur in the present situation, where Defendants procured an extension prior to the compliance date. (*See* Facility Lease § 8(h)(A).) Similarly, § 8(h)(B)(2), which prohibits exemptions or extensions that would have any substantial danger of "material civil liability," also deals with a consequence of an actual failure to comply with Applicable Law. The parties could not be exposed to material civil liability where, as here, Defendants obtain an extension prior to the original compliance date.

Section 8(h)(B)(3) deals with another potential consequence of Defendants' actual failure to comply with Applicable Law: Plaintiffs receiving late notice of obligations that they will need to assume at the conclusion of the Lease Term. By mandating that Defendants can only extend requirements of Applicable Law beyond the conclusion of the Lease Term if Defendants are currently in compliance with Applicable Law (e.g., have sought an extension prior to the original

compliance date), § 8(h)(B)(3) encourages Defendants to take action (by complying with, extending, or disputing a requirement of Applicable Law) prior to the original compliance deadline. Defendants' early action benefits Plaintiffs by apprising them prior to the original compliance deadline of any new requirements of Applicable Law that they will need to comply with after the conclusion of the Lease Term.[26]

The scope of § 8(h)(B)(3) reinforces the Court's reading of that section. Section 8(h)(B)(3) prohibits any substantial danger of *"the extension* of [a requirement of Applicable Law] *beyond* the last day of the Lease Term," connoting that § 8(h)(B)(3)'s mandate would have no application if the original compliance date was already scheduled beyond the last day of the Lease Term. (Facility Lease § 8(h)(B)(3) (emphasis added).) This coverage makes sense given that § 8(h)(B)(3) encourages timely notice. If the original compliance date was already scheduled beyond the last day of the Lease Term, Plaintiffs would already know that they likely have to comply with the requirement of Applicable Law when the Lease Term ends. In that situation, Defendants' extension would not surprise Plaintiffs with a new requirement of Applicable Law obligating the Plaintiffs, and § 8(h)(B)(3)'s concern over late notice would not be implicated.[27]

---

[26] The final sentence of § 8(h) also deals with the parties' concern over late notice. That sentence requires Defendants to notify Plaintiffs if they are contesting a requirement of Applicable Law or Governmental Action. (*See* Facility Lease § 8(h).)

[27] The Court's interpretation of §8(h) also honors the parties' general recognition that Defendants can enter into Permitted Liens (such as consent decrees) that extend beyond the last day of the Lease Term. (*See* Facility Lease §§ 5 and 7.) If Defendants fail to comply with Applicable Law or a Governmental Action, Defendants can still, under § 8(h)(B)(1), contest or extend the requirement of Applicable Law in a way that might result in the creation of a Permitted Lien. But Defendants are somewhat more constrained than usual. Whereas certain types of Permitted Liens can, under § 5 of the Facility Lease, typically extend beyond the last day of the Lease Term, if Defendants fail to comply with a requirement of Applicable Law or a Governmental Action, they lose their authority to contest or extend the requirement of Applicable Law in a way that might result in the creation of a Permitted Lien that extends beyond the last day of the Lease Term. (*See* Facility Lease § 8(h)(B).) Thus, given that Plaintiffs might have to assume responsibility for complying with Permitted Liens, § 8(h)(B)(3) prohibits Defendants from springing a new Permitted Lien (e.g., a consent decree establishing a requirement of Applicable Law that extends beyond the conclusion of the Lease Term) on Plaintiffs when the Lease Term is potentially nearing its end

Here, Defendants have not failed to comply with the requirement of Applicable Law mandating the installation of a scrubber at Rockport 2. The Consent Decree required the installation of a scrubber by December 31, 2019. Through the 2013 Modification, Defendants extended the compliance date for the scrubber requirement from 2019 to 2028. Given that Defendants did not extend the compliance date to 2028 after failing to comply with the 2019 original compliance date, § 8(h)(B)(3)'s mandate does not apply here. Accordingly, Plaintiffs' § 8 claim is dismissed.[28]

**F.    Implied Covenant of Good Faith and Fair Dealing Claim**

Lastly, Defendants move to dismiss Plaintiffs' implied covenant of good faith and fair dealing claim (Count III of the First Amended Complaint). According to Defendants, the good faith and fair dealing claim fails because it is duplicative of Plaintiffs' claims alleging a breach of express contract provisions. (Defs.' Second Mot. to Dismiss at 30–32 [ECF No. 131].) The Court agrees.[29]

Under New York law, "all contracts imply a covenant of good faith and fair dealing in the course of performance." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002). "This covenant embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (quoting *Dalton v. Educ. Testing Serv.*, 639 N.E.2d 289, 291 (N.Y. 1995)). The covenant encompasses "'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" *Id.* at 501 (quoting *Rowe v. Great*

---

(i.e., after the original deadline to comply with a requirement of Applicable Law has passed). (*See* Facility Lease § 8(h)(B).)

[28] Because the Court disposes of Plaintiffs' § 8 claim on the grounds described above, the Court need not delve into the parties' other arguments regarding that claim.

[29] Defendants move to dismiss the good faith and fair dealing claim on two additional grounds. (Defs.' Second Mot. to Dismiss at 33.) The Court need not consider these arguments though given that the Court dismisses Plaintiffs' good faith and fair dealing claim as duplicative.

*Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 569 (N.Y. 1978)). The covenant is not without limits though. "[N]o obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'" *Dalton*, 639 N.E.2d at 292 (quoting *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983)). And a cause of action alleging a breach of the covenant of good faith and fair dealing must be dismissed if it is merely duplicative of a breach of contract claim. *See MBIA Ins. Co. v. GMAC Mortg. LLC*, 914 N.Y.S.2d 604, 611 (Sup. Ct. 2010) (citing *N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 770 (N.Y. 1995)); *see also Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 894 N.Y.S.2d 47, 49–50 (App. Div. 2010) (dismissing an implied covenant of good faith and fair dealing claim as duplicative of a breach of contract claim where both claims arose out of the same facts and sought identical damages); *Netologic, Inc. v. Goldman Sachs Grp. Inc.*, 972 N.Y.S.2d 33, 34–35 (App. Div. 2013) (same); *Logan Advisors, LLC v. Patriarch Partners, LLC*, 879 N.Y.S.2d 463, 466–67 (App. Div. 2009) (same, where both claims arose out of the same facts).

Plaintiffs attempt to distinguish their good faith and fair dealing claim from their breach of contract claims. Their good faith and fair dealing claim "rests on various facts—including the particulars of Defendants' successive settlements themselves (and the trade-offs made therein), and Defendants' conscious sacrifice of Plaintiffs' interests to protect Defendants' own—which are not required to prove Plaintiffs' other claims for breach." (Pls.' Mem. in Opp'n to Second Mot. to Dismiss at 41 [ECF No. 172].) However, neither of these alleged distinctions is apparent in the First Amended Complaint. (*See* First Am. Compl. ¶¶ 41–55 [ECF No. 121].) Under Counts I and II, (alleging breach of the Facility Lease and breach of the Participation Agreement, respectively), Plaintiffs state that "[e]ach of the Defendants has breached the [relevant agreement] with each of the Trusts by the above-described actions of the Defendants." (*Id.* ¶¶ 43,

48.) Plaintiffs use this same general language as they describe the facts underlying their good faith and fair dealing claim: "Each of the Defendants has breached the covenant of good faith and fair dealing under the Facility Lease and the Participation Agreement against each of the Trusts by their above-described actions." (*Id.* ¶ 53.)

More importantly though, the distinctions that Plaintiffs raise do not actually distinguish the good faith and fair dealing claim from the breach of contract claims. Plaintiffs' breach of contract claims are inextricably intertwined with (i) the various particulars of "Defendants' successive settlements" and (ii) "Defendants' conscious sacrifice of Plaintiffs' interests to protect Defendants' own." (Pls.' Mem. in Opp'n to Second Mot. to Dismiss at 41.) Plaintiffs have argued, for example, that "[§ 6.01(j)] certainly promises, among other things, that Lessees will not obtain relief from their own wholly independent legal problems by foisting billion-dollar obligations onto Plaintiffs." (Pls.' Mem. in Supp. of Mot. for Partial Summ. J. at 25, 35–38 & n.21 [ECF No. 124] (arguing that Defendants breached § 6.01(j) only because the 2013 Modification "was *caused by Defendants' own acts or omissions*") ("Defendants expressly contend that the Permitted Lien Exclusions allow them to impose a crushing burden on Plaintiffs' interests at Defendants' sole discretion, for the acknowledged purpose of obtaining relief at *other* plants. This cannot be correct . . . .") ("[A]ctions by Congress are not a breach by Defendants, but the causal acts giving rise to claims *here* were undertaken by Defendants—who therefore *are* responsible for the 'material adverse effect' of those acts.").) Defendants breached § 8, Plaintiffs argued, because Defendants consciously chose to extend a requirement of Applicable Law (by creating the 2013 Modification) rather than comply with the original requirement of Applicable Law established by the 2007 Consent Decree. (*See id.* at 19–23 (arguing that Defendants' duties under § 8 should "be heightened here" because "[Defendants]

*themselves created* the duties they later extended, by agreeing to include the [scrubber] [r]equirement in the Consent Decree"); Pls.' Reply in Supp. of Mot. for Partial Summ. J. at 12 [ECF No. 189] (questioning what purpose § 8(h)(B)(3) could "possibly serve, other than to protect [Plaintiffs] against the transfer of legal compliance burdens to them by artful deferral"); Pls.' Mem. in Opp'n to Second Mot. to Dismiss at 16 [ECF No. 172] ("Plaintiffs respectfully submit that it is not possible to read Sections 8(a), (c) and (h) of the Facility Lease in their totality and find that the drafters meant to condone the maneuver that Defendants made through the 2013 Consent Decree Modification.").) Likewise, Plaintiffs appear to rely on numerous particulars of the 2013 Modification in asserting that Defendants have not engaged in Prudent Utility Practice. (*See* Pls.' Reply in Supp. of Mot. for Leave to File Second Am. Compl. at 11 [ECF No. 144] ("[A] prudent utility operator cannot: (1) agree to an extremely expensive requirement of law to install a scrubber without an independent mandate in law or regulation to require such an expense, (2) fail to determine in advance that the requisite regulatory approval to comply, to raise customers' rates to fund compliance, might be difficult to obtain, and (3) fail to take sufficient steps to obtain regulatory approval.").) The same facts that underlie Plaintiffs' breach of contract claims also underlie Plaintiffs' good faith and fair dealing claim.

Plaintiffs also attempt to distinguish the relief that they seek in their good faith and fair dealing claim. "This is now a declaratory judgment action," Plaintiffs explain, "in which different declarations concerning the rights breached may ultimately result in different remedies—all of which will be decided later." (Pls.' Mem. in Opp'n to Second Mot. to Dismiss at 41.) Once again, based on a review of the First Amended Complaint, the Court is unable to distinguish between the relief that Plaintiffs seek in relation to their breach of contract claims as compared to their good faith and fair dealing claim. Plaintiffs seek a generalized declaration

"that each Defendant's actions complained of herein constitute a breach of the Facility Lease, the Participation Agreement, and the covenant of good faith and fair dealing implied into both of these contracts, by each Defendant against each Plaintiff herein." (First Am. Compl. at 36–37.) And although Plaintiffs suggest that the declarations may ultimately result in different remedies, Plaintiffs fail to identify even any potential differences in the remedies. (*See* Pls.' Mem. in Opp'n to Second Mot. to Dismiss at 41–42.)

Plaintiffs attempt to circumvent this prohibition against duplicative good faith and fair dealing claims by arguing that Federal Rule of Civil Procedure 8(a) expressly permits the pleading of alternative theories. (Pls.' Mem. in Opp'n to Second Mot. to Dismiss at 36.) But the requirement that a good faith and fair dealing claim not duplicate a breach of contract claim is a substantive feature of New York law. *See Xpedior Creditor Trust v. Credit Suisse First Bos. (USA) Inc.*, 341 F. Supp. 2d 258, 272 (S.D.N.Y. 2004) ("[A]s a matter of New York law, the same operative facts cannot simultaneously give rise to claims for both implied and express covenants."); *cf., e.g., N.Y. Univ.*, 662 N.E.2d at 770; (dismissing a good faith and fair dealing claim because it was duplicative of the plaintiff's breach of contract claim); *Amcan Holdings*, 894 N.Y.S.2d at 49–50 (same). Accordingly, Federal Rule 8(a) does not control the present analysis; New York law does. *Cf. Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (applying New York law and dismissing a good faith and fair dealing claim because it was based on the same facts as the plaintiff's breach of contract claim).[30]

---

[30] Plaintiffs cite two decisions from the United States District Court for the Southern District of New York for the proposition that a plaintiff can alternatively plead breach of contract and good faith and fair dealing claims under the Federal Rules of Civil Procedure. (Pls.' Mem. in Opp'n to Second Mot. to Dismiss at 36 (citing *DiFolco v. MSNBC Cable L.L.C.*, No. 06 Civ. 4728, 2007 WL 959085, at *4 (S.D.N.Y. Mar. 30, 2007); *Xpedior*, 341 F. Supp. 2d at 272).) The Second Circuit has since held, however, that under New York law redundant good faith and fair dealing claims should be dismissed. *Cruz*, 720 F.3d at 125.

Finally, Plaintiffs contend that "New York courts routinely permit plaintiffs to maintain simultaneously claims for breach of both express terms and the implied covenant of good faith and fair dealing, based on the same conduct." (Pls.' Mem. in Opp'n to Second Mot. to Dismiss at 37.) Plaintiffs, however, do not cite any decisions in which a New York court has held that a plaintiff can bring a good faith and fair dealing claim that is duplicative of a breach of contract claim. *See Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*, 949 N.Y.S.2d 115, 118–19 (App. Div. 2012) ("Contrary to Bartlett's contentions, the cause of action alleging a breach of the covenant of good faith and fair dealing . . . is not duplicative of the cause of action alleging breach of contract."); *see also Kirke La Shelle Co. v. Paul Armstrong Co.*, 188 N.E. 163, 168 (N.Y. 1933); *Legend Autorama, Ltd. v. Audi of Am., Inc.*, 954 N.Y.S.2d 141, 143–44 (App. Div. 2012).

Because Plaintiffs' good faith and fair dealing claim is duplicative of Plaintiffs' breach of contract claims, the good faith and fair dealing claim is dismissed.

## VI.   CONCLUSION

For the reasons stated above, Defendants' Motion for Partial Judgment on the Pleadings [ECF No. 88] and Second Motion to Dismiss [ECF No. 131] are **GRANTED**; Plaintiffs' Motion for Partial Summary Judgment [ECF No. 123] and Motion for Leave to File a Surreply [ECF No. 197] are **DENIED**; and Plaintiffs' Motion for Leave to File a Second Amended Complaint [ECF No. 127] and Defendants' Omnibus Motion for an Extension, for a Stay, and to Strike [ECF No. 106] are **DENIED AS MOOT**.

   **IT IS SO ORDERED.**

3-28-2016
_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**