# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  June 08, 2017

Mr. Rollo Clyde Baker IV
Quinn, Emanuel, Urquhart & Sullivan
51 Madison Avenue
22nd Floor
New York, NY 10010

Mr. Richard P. Bress
Latham & Watkins
555 11th Street, N.W.
Suite 1000
Washington, DC 20004

Mr. Peter Evan Calamari
Quinn, Emanuel, Urquhart & Sullivan
51 Madison Avenue
22nd Floor
New York, NY 10010

Mr. Stephen E. Chappelear
Frost Brown Todd
10 W. Broad Street
Suite 2300
Columbus, OH 43215

Mr. David L. Elsberg
Quinn, Emanuel, Urquhart & Sullivan
51 Madison Avenue, 22nd Floor
New York, NY 10010

Mr. Drew Curtis Ensign
Latham & Watkins
555 11th Street, N.W., Suite 1000
Washington, DC 20004

Mr. James B Hadden
Murray, Murphy, Moul and Basil
1114 Dublin Road, Suite 150
Columbus, OH 43215

Mr. Russell J. Kutell
Frost Brown Todd
10 W. Broad Street, Suite 2300
Columbus, OH 43215

Mr. Edward J. Shapiro
Latham & Watkins
555 11th Street, N.W., Suite 1000
Washington, DC 20004

Mr. Benjamin W. Snyder
Latham & Watkins
555 11th Street, N.W., Suite 1000
Washington, DC 20004

Mr. Sanford Ian Weisburst
Quinn, Emanuel, Urquhart & Sullivan
51 Madison Avenue, 22nd Floor
New York, NY 10010

> Re:    Case No. 16-3496, *Wilmington Trust, et al v. AEP Generating Co., et al*
>         Originating Case No. : 2:13-cv-01213

Dear Counsel,

  Pursuant to the order granting rehearing, enclosed is a copy of the court's amended opinion
and judgment.

                              Yours very truly,

                              Deborah S. Hunt, Clerk

                              Cathryn Lovely
                              Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0119p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

WILMINGTON TRUST COMPANY, a Delaware corporation, acting in its capacity as owner trustee of AEGCO Trust 1, AEGCO Trust 2, AEGCO Trust 5, I&M Trust 1, I&M Trust 2, and I&M Trust 5, and not in their individual capacities,

*Plaintiff-Appellant*,

⎫
⎬  No. 16-3496
⎭

*v.*

AEP GENERATING COMPANY, an Ohio corporation; INDIANA MICHIGAN POWER COMPANY, an Indiana corporation,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:13-cv-01213—Edmund A. Sargus, Jr., Chief District Judge.

Argued: March 9, 2017

Decided and Filed: June 8, 2017

Before: CLAY, SUTTON, and GRIFFIN, Circuit Judges.

---

### COUNSEL

**ARGUED:** Richard P. Bress, LATHAM & WATKINS LLP, Washington, D.C., for Appellant. David L. Elsberg, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, for Appellees. **ON BRIEF:** Richard P. Bress, Edward J. Shapiro, Drew C. Ensign, Benjamin W. Snyder, LATHAM & WATKINS LLP, Washington, D.C., Stephen E. Chappelear, Russell J. Kutell, FROST BROWN TODD LLC, Columbus, Ohio, for Appellant. David L. Elsberg, Sanford I. Weisburst, Peter E. Calamari, Rollo Baker, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, for Appellees.

———————————————

**AMENDED OPINION**

———————————————

GRIFFIN, Circuit Judge.  Nearly twenty years after defendants built, sold, and leased back a coal-burning power plant, they committed to either make over a billion dollars of emission control improvements to the plant, or shut it down.  Defendants did so by way of a consent decree, resolving various lawsuits involving alleged Clean Air Act violations at their other power plants.  The genesis of this dispute is what happened next:  they successfully obtained a modification to the consent decree providing that these improvements need not be made until after their lease expired, thus pushing their commitments to improve the air quality of the plant's emissions to the plant's owners (represented here by plaintiff, their trustee).  The district court held this encumbrance did not violate the terms of the parties' contracts governing the sale and leaseback arrangement, and that plaintiff's breach of contract claims precluded it from maintaining an alternative cause of action for breach of the covenant of good faith and fair dealing.  We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

Affiliates American Electric Power and Indiana Michigan Power Company (collectively, AEP or defendants) sell, transmit, and distribute electric power.  In the 1980s, they built two large coal-burning power plants in Rockport, Indiana, dubbed "Rockport 1" and "Rockport 2." Among the largest of their kind in the country, these units are efficient, low-cost, and "relatively young."  Defendants completed Rockport 2, the focus of this litigation, in 1989, and it has an expected economic useful life of forty-five to sixty years—through 2034 to 2049.

A.

Defendants financed Rockport 2's construction through a sophisticated sale and leaseback arrangement with investor-owned trusts (collectively, owners).  Finalized in 1989, the arrangement largely functions as follows:  each investor formed a pair of trusts (one for each defendant); each trust purchased a portion of defendants' interest in Rockport 2; and each trust

leased the interest back to defendants for a period of thirty-three years—through December 7, 2022. As a result, the owners receive annual rent payments, tax and accounting benefits, and, as important here, the value of Rockport 2 after the lease expires (what the parties call its "residual value").

With this complex deal came several interlocking instruments. Two sections from two of these instruments are at the core of the owners' claims, each providing some protection to the plant's residual value. First, Section 6.01(j) of the Participation Agreement broadly prohibits AEP from "tak[ing] any action . . . which will materially adversely affect the operation, safety, capacity, economic useful life or any other aspect of Unit 2 . . . ." Second, Section 7 of the Facility Lease provides that AEP "shall not directly or indirectly create, incur or suffer to exist any Lien"[1] on Rockport 2, "except Permitted Liens." There are seventeen types of Permitted Liens, with "clause (x)" being the focal point of this appeal:

> rights reserved to or vested in any Governmental Authority to condemn or appropriate the Undivided Interest, Unit 2, any Modification, the Unit 2 Site, the Unit 2 Site Interest, the Common Facilities, the Easements, the Rockport Plant Site or the Rockport Plant, or to control or regulate any of the foregoing or the use thereof in any manner[.]

## B.

Beginning in 1999, the United States Environmental Protection Agency, many states, and private environmental organizations commenced numerous environmental lawsuits against several AEP affiliates, including defendant Indiana Michigan Power Company. These lawsuits, consolidated in the Southern District of Ohio, alleged AEP's affiliates modified thirteen power plants across the country without installing certain pollution controls in violation of the Clean Air Act. There was no allegation of misfeasance at Rockport, and the owners were not involved.

The parties to these lawsuits resolved the claims by way of a consent decree approved by the district court in 2007. Of import, the consent decree required AEP to modify both Rockport plants (notwithstanding the lack of alleged violations at these facilities). For Rockport 2, AEP

---

[1] The Facility Lease separately defines Liens, and the parties do not dispute defendants' actions, as set forth here, encumbered Rockport 2 with a Lien under the Facility Lease's definition.

agreed to install emissions-limiting devices by December 31, 2019.  One of these devices, a scrubber, reduces sulfur dioxide emissions and costs approximately $1.4 billion.

Defendants later sought to alter this agreement.  Initially, they requested permission to install a substantially less expensive pollution control system in place of the scrubber.  Following opposition from various plaintiffs, the parties agreed to modify the consent decree in 2013. Regarding Rockport 2, AEP agreed to install the less expensive system by April 16, 2015, and "Retrofit, Retire, Re-power, or Refuel" it by December 31, 2028.  "Retrofit" means installing a scrubber, "Retire" means "permanently shut down and cease to operate the Unit," "Re-power" means replacing the coal-burning technology, and "Refuel" means converting it to natural gas.

The effect of the modification is substantial.  By pushing the "Retrofit, Retire, Re-power, or Refuel" requirement to 2028 (six years *after* the expiration of the Facility Lease), the owners are now responsible for the costs associated with either upgrading Rockport 2 or shutting it down.

## C.

Plaintiff, the owners' trustee, commenced this litigation in the Southern District of New York a few months after the entry of the amended consent decree.  It alleged three causes of action that are relevant for our purposes:  (1) breach of the Facility Lease by imposing an impermissible Lien; (2) breach of Section 6.01(j) of the Participation Agreement by taking an action that materially adversely affected the economic useful life of Rockport 2; and (3) breach of the covenant of good faith and fair dealing by curtailing Rockport 2's economic useful life. The New York district court transferred the case to the Southern District of Ohio pursuant to 28 U.S.C. § 1404(a).

On January 13, 2015, the district court dismissed the Facility Lease claim, holding that the consent decree's requirements, as modified, constituted a Permitted Lien under Section 7. On March 28, 2016, the district court dismissed the Participation Agreement claim, reasoning the Permitted Lien's specific authorization governed over the Participation Agreement's more generalized prohibition, and concurrently denied the owners' motion for partial summary judgment.  It also dismissed the good faith and fair dealing claim as duplicative of the express

breach of contract claims. Following voluntary dismissal of the remaining claims, the district court entered judgment in favor of defendants. Plaintiff filed a timely notice of appeal.

## II.

### A.

We review the district court's dismissal of the owners' claims—under both Rule 12(c) and 12(b)(6)—de novo. *Florida Power Corp. v. FirstEnergy Corp.*, 810 F.3d 996, 999–1000 (6th Cir. 2015). We take as true all well-pleaded material allegations in the opposing party's pleadings, and affirm the district court's grant of the motion only if the moving party is entitled to judgment as a matter of law. *Id.*

We review the district court's decision on the owners' motion for summary judgment de novo. *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 526 (6th Cir. 2014). "Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.*

### B.

New York law governs this dispute pursuant to the terms of the applicable instruments' choice of law provisions. "Under New York contract jurisprudence, the intent of the parties controls and if an agreement is complete, clear and unambiguous on its face, it must be enforced according to the plain meaning of its terms." *Beardslee v. Inflection Energy, LLC*, 31 N.E.3d 80, 84 (N.Y. 2015) (internal quotations and brackets omitted). "This principle is particularly important in the context of real property transactions, where commercial certainty is a paramount concern, and where the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length." *S. Rd. Assocs., LLC v. Int'l Bus. Machines Corp.*, 826 N.E.2d 806, 809 (N.Y. 2005).

"Whether a contract is ambiguous is a question of law." *Banos v. Rhea*, 33 N.E.3d 471, 475 (N.Y. 2015). "An agreement is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself,

and concerning which there is no reasonable basis for a difference of opinion.  Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or when specific language is susceptible of two reasonable interpretations."  *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014) (internal quotations, citations, and brackets omitted).  An ambiguous contract usually "presents a question of fact that may not be resolved by the court on a motion for summary judgment."  *Five Corners Car Wash, Inc. v. Minrod Realty Corp.*, 20 N.Y.S.3d 578, 579–80 (N.Y. App. Div. 2015) (citation omitted).  However, "it is the responsibility of the court to interpret" an ambiguous contract when the parties, as here, do not offer extrinsic evidence with respect to the ambiguity's meaning.  *Cellutech, Inc. v. Watertown Indus. Ctr. Local Dev. Corp.*, 839 N.Y.S.2d 890, 891 (N.Y. App. Div. 2007); *see also Mallad Const. Corp. v. Cty. Fed. Sav. & Loan Ass'n*, 298 N.E.2d 96, 99 (N.Y. 1973).

Courts must review the "entire contract," considering "particular words . . . not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby."  *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 363 (N.Y. 2009) (brackets omitted).  That is, "[f]orm should not prevail over substance and a sensible meaning of words should be sought."  *Id.* (citation omitted).  "Although all portions of a contract should be read together to determine its meaning, courts may not distort the meaning of words, under the guise of interpretation, so as to create a new contract."  *Banos*, 33 N.E.3d at 476 (internal citation omitted).  In reading a contract as a whole, a court must not render any provision meaningless.  *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007).  Finally, a court reads together related instruments executed at the same time.  *In re Herzog*, 93 N.E.2d 336, 339 (N.Y. 1950).

III.

The crux of this dispute is whether AEP's commitment to have a scrubber installed at Rockport 2 after the lease expires constitutes an exception to Section 7's "no lien" provision under Permitted Lien clause (x).  To fit within this exception, the scrubber mandate must (1) be a

right "reserved to or vested in any Governmental Authority"[2] that (2) involves the power "to condemn or appropriate" or "to control or regulate" Rockport 2 "in any manner."  The district court broadly construed clause (x), reasoning "the word 'vested' is not limited or modified by any restriction on how the Governmental Authority may come to acquire the power to regulate or control Rockport 2.  As such, the only reasonable reading of the definition is that it could include powers of Governmental Authorities such as the EPA to negotiate and settle by agreement with the Defendants."  This reading conflicts with clause (x)'s plain meaning and the Facility Lease as a whole.

First, the district court conflated the Facility Lease's careful use of verb tense.  "Reserved to or vested in" plainly connotes a current ability to exercise a present or future right.  *Compare Vested*, Black's Law Dictionary (6th ed. 1990) ("Fixed; accrued; settled; absolute; complete. . . . Rights are 'vested' when right to enjoyment, present or prospective, has become property of some particular person or persons as present interest[.]"), *and Vested Right*, Black's Law Dictionary (6th ed. 1990) ("Immediate or fixed right to present or future enjoyment and one that does not depend on an event that is uncertain."), *and Reserved*, Black's Law Dictionary (6th ed. 1990) ("Retained, kept or set apart[.]"), *with Vest*, Black's Law Dictionary (6th ed. 1990) ("[T]o give an immediate, fixed right of present or future enjoyment."), *and Reserve*, Black's Law Dictionary (6th ed. 1990) ("To keep back . . . for future or special use[.]").  Therefore, "reserved to or vested in" means existing rights to act in the present or future at the time of the Facility Lease's execution, but excludes rights that vest in the future.[3]

Based on this plain language reading, we look to what rights the EPA (as a Governmental Authority) had to condemn, appropriate, control, or regulate Rockport 2 when the parties finalized the sale and leaseback arrangement.  At that time, the EPA had the general power to commence proceedings to enforce the Clean Air Act and to settle such proceedings through a consent decree.  42 U.S.C. § 7413(b), (g).  And it exercised this power by initiating and

---

[2]"Governmental Authority" means "any Federal, state, county, municipal, foreign, international, regional or other governmental authority, agency, board, body, instrumentality or court."

[3]Indeed, Section 8 of the Facility Lease differentiates between "vesting" and "shall vest" in the context of securing title to certain property after a condition precedent, reflecting that the parties further appreciated the temporal difference between these two terms.

ultimately settling enforcement litigation against various AEP affiliates for alleged Clean Air Act violations at *other* coal-burning power plants. But it did not do so with respect to Rockport 2. Rather, having made no allegations regarding the owners' plant, the EPA gained the ability to impose the scrubber requirement only by virtue of the consent decree agreed to by its lessees— one whereby AEP traded away Rockport 2's long-term value in exchange for a more favorable settlement of claims against their other interests.

For defendants to prevail, therefore, they must show the Facility Lease expressly allowed them to "create" a right for the EPA to condemn, appropriate, control, or regulate Rockport 2 independent of its abilities under the Clean Air Act. The district court found such support in Section 7's prefatory language: "The Lessee shall not directly or indirectly create, incur or suffer to exist any Lien . . . except Permitted Liens." This language, reasoned the district court, "suggests that the Defendants may take actions to 'create' Permitted Liens."

This is only half-right. True enough, the Permitted Lien's definition allows AEP to create Liens, like those arising during the normal course of regular operations. This would include, for example, those Liens made "in connection with any Modification or arising in the ordinary course of business" under Permitted Lien clause (v) or replacement parts under Permitted Lien clauses (xv) and (xvi). However, the district court's untethered interpretation ignores Section 7's "suffer to exist" preface and the "reserved to or vested in" clause. Given the latter's plain meaning, AEP cannot create clause (x) liens and instead may allow them only to suffer to exist; to read "create" as an all-encompassing right, as the district court did, renders these other phrases superfluous. *See Beal*, 865 N.E.2d at 1213 (courts must not render any provision meaningless); *see also Bombay Realty Corp. v. Magna Carta, Inc.*, 790 N.E.2d 1163, 1165 (N.Y. 2003) ("All parts of a contract must be read in harmony to determine its meaning."). In sum, the "create" language of Section 7 does not support defendants' position that the Facility Lease permitted them *to vest*—i.e., create after the fact—additional powers in the EPA not already provided at the time of the parties' agreement.

Second, the district court failed to construe the Facility Lease as a whole. New York contract law focuses both on the forest and the trees when determining a contract's meaning. It does so, however, under the proviso of not breathing life into certain terms so as to rewrite

contractual obligations:    "Although all portions of a contract should be read together to determine its meaning, courts may not distort the meaning of words, under the guise of interpretation, so as to create a new contract."   *Banos*, 33 N.E.3d at 476 (internal citations omitted); *see also Beardslee*, 31 N.E.3d at 84 ("Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."  (alterations and citations omitted)).

Yet, this is exactly what the district court did when it broadly construed clause (x). By reading the Facility Lease to allow AEP to settle litigation regarding alleged Clean Air Act violations at other plants by way of a consent decree affecting Rockport 2 and then encumber the owners' interests in Rockport 2 via the 2013 modification, the district court gave AEP carte blanche authority to avoid the very "Permitted Lien" clause that covers judgments and awards against defendants' interests in Rockport 2—clause (vii).   Under that clause, AEP can pass a judgment Lien to the owners only if they appeal in good faith, set aside adequate reserves, and ensure that the Lien does not "involve any danger of the foreclosure, forfeiture or loss" of Rockport 2, or any use thereof.   The district court's view of clause (x) renders this provision nugatory.  *Beal Sav. Bank*, 865 N.E.2d at 1213; *cf. Gallo v. Moen, Inc.*, 813 F.3d 265, 269 (6th Cir. 2016) (warning against construing contract language "to find 'elephants in mouseholes'") (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).

Nor does the district court's buttressing of its Permitted Lien reading with reference to the modification provisions in Section 8 of the Facility Lease withstand scrutiny.   Section 8(c) contemplates AEP would have to expend capital to operate and maintain Rockport 2 during the lease, including making either mandatory or permissive "Modifications":

> The Lessee, at its expense . . . shall participate in the making of any Modification required by the Operating Agreement or, subject to Section 8(h), by any Applicable Law or Governmental Action.  In addition, the Lessee, at its expense . . . , from time to time may participate in the making of any Modification that the Lessee may deem desirable in the conduct of its business; provided, however, that the Lessee shall not have the right to participate in the making of any such optional modification that will materially diminish the value or utility of Unit 2 or materially reduce its remaining useful life.

No. 16-3496          *Wilmington Trust Co. v. AEP Generating Co., et al.*          Page 10

(Emphasis omitted.)   Section 8(d)(iii) additionally provides that in the case of "Severable Modifications" that are "required by the Operating Agreement or by Applicable Law or Governmental Action," the owners (assuming they did not finance it) have the option to either rent or purchase that modification at the end of the lease.   One specific type of Severable Modification enumerated by the Facility Lease is the installation of a scrubber "that is required by Applicable law."   Because the Facility Lease defines "Applicable Law" as including "decrees" and "orders," the district court reasoned the 2013 modification's scrubber mandate "would be a Severable Modification."

This reasoning is not convincing.   It is true the plain language of Section 8 shows the parties contemplated AEP might have to install a scrubber at Rockport 2 during the lease.   But the modification provision of Section 8(c) only becomes applicable if AEP actually takes part in "the *making* of any Modification."   (Emphasis added.)   And Section 8(d) only speaks in terms of modifications that are installed at Rockport 2; under Section 8(d)(iii), AEP retains title to any unfinanced Severable Modification, and the owners have the option to either purchase or rent it for a certain value.   The plain language of Section 8 only makes sense if AEP actually installs the scrubber.   It does not apply to commitments to do so in the future.

We reject AEP's attempt to recast the lack of a current scrubber as something that is good for both parties.   In AEP's view, because the 2013 modification "deferred the obligation to install the scrubber until 2028, and provided other options that could achieve the same emission reductions, the Owners have *several more years* (during which they may operate Rockport 2 without a scrubber) to evaluate which of [their] options is most economically and operationally advantageous under the regulatory and market conditions that then exist."   AEP may very well be right that the modification is economically beneficial to the owners.   However, that is a different agreement—one the owners were not a part of, and one that is outside the four corners of the Facility Lease.[4]

---

[4]The same goes for AEP's request that we look outside the contract to what one of the owners said at the time of entry of the original consent decree.  *See S. Rd. Assocs.*, 826 N.E.2d at 810 (when a contract is unambiguous, "extrinsic evidence such as the conduct of the parties may not be considered").

Accordingly, the district court erred in holding that the consent decree, as modified, constituted a "Permissible Lien" under Section 7 of the Facility Lease.[5]

IV.

On remand, we provide the following instructions.

First, the district court dismissed the owners' Section 7 claim relatively early on in this litigation pursuant to Rule 12(b)(6). Its reasoning in doing so served as the foundation for dismissing the Section 6.01(j) claim. Like the district court, the parties equally recognized the starring role the Permitted Lien exception plays in this case, devoting a majority of submissions and nearly all of oral argument to Section 7's particular language governing Permitted Liens. Given that section unambiguously supports the owners' position—language which "must be enforced according to the plain meaning of its terms," *Beardslee*, 31 N.E.3d at 84—we reverse the district court's dismissal of the owners' Section 7 claim.

Second, the owners sought partial summary judgment below on their Section 6.01(j) claim, requesting the district court "determine that . . . if Defendants' actions 'materially adversely affected' Lessors' Undivided Interests in Rockport 2 (a fact issue reserved for later determination), then Defendants breached Section 6.01(j)." The district court declined, and granted AEP's motion for partial judgment on the pleadings and motion to dismiss the Section 6.01(j) claim on the ground that Section 7's Permitted Lien exception excused AEP's alleged noncompliance with Section 6.01(j). Having resolved the Permitted Lien issue in the owners' favor, we reverse the district court's dismissal of the Section 6.01(j) claim, vacate the denial of partial summary judgment, and remand for further proceedings.

Finally, we affirm the district court's dismissal of plaintiff's breach of the covenant of good faith and fair dealing claim as duplicative of the breach of contract claims.

---

[5]We therefore need not consider the owners' alternative argument that the scrubber mandate does not fall within the "required by Applicable Law" exception, nor need we opine (as the district court did) on whether Section 7's Permitted Lien provision conflicts with Section 6.01(j).

No. 16-3496            *Wilmington Trust Co. v. AEP Generating Co., et al.*            Page 12

V.

For these reasons, we affirm in part and reverse in part the district court's judgment, and remand for other proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 16-3496

WILMINGTON TRUST COMPANY,
a Delaware corporation, acting in its capacity
as owner trustee of AEGCO Trust 1, AEGCO Trust 2,
AEGCO Trust 5, I&M Trust 1, I&M Trust 2, and I&M
Trust 5, and not in their individual capacities,
      Plaintiff - Appellant,

     v.

AEP GENERATING COMPANY, an Ohio
corporation; INDIANA MICHIGAN POWER
 COMPANY, an Indiana corporation,
      Defendants - Appellees.

```
┌─────────────────────────────┐
│          FILED              │
│       Jun 08, 2017          │
│   DEBORAH S. HUNT, Clerk    │
└─────────────────────────────┘
```

Before:  CLAY, SUTTON, and GRIFFIN, Circuit Judges.

# AMENDED JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED IN PART AND REVERSED IN PART, and the case is REMANDED for other proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk